THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ARTHUR E. MARTIN *et al.*, Defendants-Appellants.

First District (2nd Division) No. 80—2432

Opinion filed January 25, 1983.

Stephen Clark and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellants.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and David L. Kind, Assistant State's Attorneys, of counsel), for the People.

JUSTICE PERLIN delivered the opinion of the court:

Defendants, Arthur Martin and Darnell Jenkins, were charged in a four-count indictment with the murder and armed robbery of Joshua Beasley. (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(a)(1), (a)(2), (a)(3) and 18—2.) In a bench trial, both defendants were found guilty on all counts and judgment was entered accordingly. Defendants were sentenced to serve concurrent terms of 30 years for murder and 20 years for armed robbery in the Illinois Department of Corrections. On appeal defendants contend that they were deprived of their right to the effective assistance of counsel; that they were denied a fair trial by the prosecutor's suggestions that the testimony of certain witnesses was the product of intimidation; that they were not proved guilty beyond a reasonable doubt; that the trial court erred in denying their motions for a new trial; that the trial court abused its discretion in sentencing defendants to 30 years' imprisonment for murder; and that they were improperly convicted of both armed robbery and murder. For the reasons hereinafter stated, we affirm the convictions and sentences for armed robbery and for murder under the first count of the indictment (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(a)(1)) and vacate the convictions for murder under the second and third counts of the indictment (Ill. Rev. Stat. 1977, ch. 38, pars. 9—1(a)(2), (a)(3)).

The victim, Joshua Beasley, resided in an 11th floor apartment in a Chicago Housing Authority facility located at 2145 West Lake Street in Chicago (2145 building). Lena Mae Beasley, his first wife, testified that at approximately 6 p.m. on Sunday, January 27, 1980, Beasley accompanied her from his apartment to the ground floor. Upon reaching the ground floor, Mrs. Beasley stepped out of the elevator and a young black man ran past her and jumped into the elevator. Another young man in the courtyard of the building "hollered at him" to hold the elevator. In the courtyard two men appeared to be forcing a third man towards the elevator. Mrs. Beasley stated that all of the men were "in their twenties" but could not describe them in any greater detail because it was too dark. She looked back at Beasley, who was still in the elevator, to try to get his attention to tell him something was wrong. Beasley asked her what she was looking at but she was afraid to answer and hoped that he would "catch her eye"

and get out of the elevator. Beasley told her not to stand there because it was getting dark and she had a bus to catch. Mrs. Beasley then walked to the bus stop. Beasley was wearing a white fur hat, a three-quarter length brown leather jacket with buttons, black leather gloves, pants and a sweater. He was also wearing a birthstone ring.

Perry Lewis, who was 17 years old at the time of trial, testified that he was playing on the stairs in the 2145 building with his 12-year-old cousin, Odessa Turner, when he heard a moan on the 11th floor. Lewis walked to the stairwell of the 11th floor where he saw both defendants, whom he had known for three years, and a third unidentified man with Joshua Beasley. Jenkins and the third man were holding Beasley while Martin stood in front of him demanding his money. When Beasley replied that he had none, Martin searched Beasley's pockets, found his wallet and said, "I thought you didn't have any money." Beasley pleaded with Martin, saying, "I need this money very bad, I need it badder than you do." According to Lewis, Martin then began striking Beasley on the side of his head with an object that was approximately 12 inches long. Jenkins and the third man removed Beasley's coat, Martin hit him again and Beasley "slid down the wall." The three offenders then approached the stairwell where Lewis had witnessed the attack on Beasley. Lewis ran up one flight of stairs and then began to jump down the stairs as if he were playing. On the 11th floor Lewis encountered Martin and asked him, "What's up Red [Martin's nickname]?" Martin threatened him, saying, "If you see anything, if you tell anybody you see anything, something is going to happen to you."

Lewis testified that he observed the three men with Beasley for between 10 and 20 minutes and that his cousin, Odessa Turner, was not with him during that interval. He did not call for help because he was frightened. Lewis admitted that he did not tell the police what he knew until they interviewed him on March 11, 1980, more than six weeks after the crime. He explained that he did not approach the police earlier on his own initiative because he was scared. The same evening Lewis returned from the police station, defendant Martin's brother, Charles Martin, came over to his apartment and threatened him. Lewis testified that "he [Charles Martin] said that Red [defendant Martin] said that if he get indicted, something was going to happen to me." Martin did not elaborate but told Lewis, "You will find out." Lewis then moved out of the 2145 building.

The police discovered Beasley's body lying face up on the kitchen floor of his 11th floor apartment shortly before 7 p.m. on January 27. There were bloodstains around his head and the crime scene indicated

that Beasley crawled to his apartment after the beating. He was already dead when the police arrived and his body was removed to the Cook County Morgue where Dr. Edmund R. Donoghue, a forensic pathologist, performed the autopsy.

Dr. Donoghue testified that he observed 21 evidences of external injury, consisting of lacerations, bruises and abrasions over his head, arms, knees and back, and three evidences of internal injury, consisting of hemorrhages under the scalp, on the back of the neck and under the skin overlying that part of the chest where the collarbones join the breastbone. Dr. Donoghue stated that these injuries were consistent with the use of blunt force. The autopsy also revealed that Beasley had severe coronary atherosclerosis (hardening of the arteries) and a thrombosis or total occlusion of the left descending anterior artery and that he had suffered prior heart attacks. Dr. Donoghue concluded that the cause of Beasley's death was "arteriosclerotic cardiovascular disease secondary to the beating." By "secondary to the beating" he meant that Beasley had very severe heart disease and the stress of the beating placed such a strain on his heart that he died. The beating "definitely aggravated" Beasley's heart condition and "caused his death at this time." A person without heart disease probably would not have been killed by the injuries Beasley sustained.

Both defendants testified in their own defense and denied that they had robbed or beaten the victim. Their testimony was substantially the same. Jenkins stated that he spent the afternoon of January 27, 1980, in his apartment in the 2145 building with his mother, Geraldine Jenkins, and his girlfriend, Frances Sims. Both Mrs. Jenkins and Ms. Sims corroborated this testimony. At approximately 6:30 or 6:45 p.m., Jenkins went to Martin's apartment on the 14th floor of the same building to celebrate Martin's birthday. Martin and his common law wife, Evelyn Jackson, testified that they had spent most of the day in their apartment with their children. Although Martin's birthday is March 7, Ms. Jackson explained that Martin usually celebrates his birthday more than a month early. She could not recall, however, whether there was a birthday celebration for Martin on January 27.

The defendants testified that after a few minutes they left Martin's apartment, walked to the 12th floor, took the elevator to the seventh floor where they tried to find Dwayne Beasley, the victim's son, and then walked downstairs to the first floor. Lester Neal, a resident of the same building, corroborated Martin's testimony that Martin and Jenkins had visited his seventh floor apartment looking for Dwayne Beasley. Jonathan Regunberg, an assistant State's Attorney,

testified in rebuttal that on March 11, 1980, Martin told him that when defendants left Martin's apartment, they proceeded downstairs without stopping on the seventh floor.

Defendants testified that they drove downtown, ate dinner at the Windy City Restaurant and went to the Woods Theater. Martin stated that they arrived at the theater at approximately 7:45 p.m. and stayed for 2½ hours. At trial, the defendants could not remember which movies they had seen. On cross-examination, Martin admitted that on March 11, 1980, he told Assistant State's Attorney Regunberg that he had seen either "The Onion Field" or "The Tattoo Connection." In rebuttal, Regenberg testified that Martin said that they had seen "The Onion Field," and Jenkins said that they had seen "Cult of the Damned." Jenkins testified that he never mentioned the name of the movie to Regunberg. Fidel Irizarri, a friend of Martin and an employee of the Woods Theater, testified that he saw Martin at the theater on January 27, 1980, at approximately 8:30 p.m. The theater was showing "Night Charge, Night Child," "Police Woman" and "Tattoo Connection." According to Irizarri, the theater never exhibited "Cult of the Damned." Martin testified that he saw his friends, the Sanders sisters, at the theater, and Lily Sanders corroborated this statement.

Defendants testified that they left the theater between 10:15 and 10:30 p.m., stopped at a liquor store and then drove home. Martin and Evelyn Jackson both stated that he returned to their apartment between 10:45 and 11:30 p.m. Geraldine Jenkins stated that her son returned at 2 a.m.

Odessa Turner, Perry Lewis' cousin, denied seeing Perry Lewis at any time on January 27, 1980. She stated that on the night before she testified she received a telephone call from Lewis who threatened her that if she told the truth, Lewis and his friend Darryl Lee would catch her "by herself." Turner testified further that on July 24, 1980, during the court proceedings, Lewis' mother threatened her while she was sitting in a waiting room. Turner also stated that Lewis' sister kidnaped Turner's mother's baby. On cross-examination, Turner admitted that prior to trial she told an assistant State's Attorney that she had been playing on the stairs with Perry Lewis on January 27, 1980.

Susie Turner, another resident of the 2145 building and Perry Lewis' aunt, testified that on July 15, 1980, eight days before trial commenced, Perry Lewis visited her apartment and told her he had lied about defendant Martin and that Martin was innocent. Lewis denied that he had ever discussed the killing with his aunt.

Dwayne Beasley, the victim's son and a friend of defendant Martin, testified that Martin and Joshua Beasley were friends and that Martin occasionally loaned him money because he knew Beasley was poor. Beasley identified Defense Exhibit No. 3, a gold wedding band, as a ring which his father had worn. The ring had no identifying marks and Beasley did not know whether his father was wearing it on January 27. Willie Patton testified that he purchased the ring and a watch from Perry Lewis and Darryl Lee on January 28 or 29, 1980, for $15. Patton also tried on a "quarter length" brown leather coat they showed him. Lewis denied that he had attempted to sell Patton a gold band, a watch or a leather coat and stated that he had last seen Patton on January 27, 1980. Patton testified that he sold the ring to a jewelry store and pawn shop on March 6, 1980, for $24 and gave the original receipt for the ring to Geraldine Jenkins. Dwayne Beasley testified that sometime after his father's death, he, Willie Patton, Evelyn Jenkins and Geraldine Jenkins went to a pawn shop and Mrs. Jenkins bought the ring. Mrs. Jenkins stated that only Patton accompanied her to the store.

Vanessa Beasley, the victim's daughter, testified in rebuttal that she had seen her father wear a birthstone ring but had never seen him wear any other ring. Lena Mae Beasley, the victim's first wife, testified in the State's case in chief that Joshua Beasley was not wearing a wedding band on January 27, 1980.

The trial court found both defendants guilty on all counts of the indictment, entered judgment thereon and sentenced each defendant to concurrent terms of imprisonment of 30 years for murder and 20 years for armed robbery.

I

Defendants first contend that they were deprived of their constitutional right to the effective assistance of counsel. Each defendant was represented by his own privately retained counsel. The Illinois Supreme Court has not yet decided whether the same standard of competence applies to both retained and appointed counsel. (See *People v. Williams* (1983), 93 Ill. 2d 309, 324-26.) Decisions from four of the five districts of our appellate court, however, have held in conformity with the United States Supreme Court's opinion in *Cuyler v. Sullivan* (1980), 446 U.S. 335, 64 L. Ed. 2d 333, 100 S. Ct. 1708, that the effectiveness of counsel, retained or appointed, is to be measured by one standard: whether the attorney is actually incompetent as reflected in the performance of his duties as a trial attorney, and whether that incompetence produced substantial prejudice to the defendant such that

the outcome of the trial was probably changed. (*People v. Moore* (1981), 105 Ill. App. 3d 264, 269-70, 434 N.E.2d 300; *People v. Talley* (1981), 97 Ill. App. 3d 439, 442-43, 422 N.E.2d 1084; *People v. Lovitz* (1981), 101 Ill. App. 3d 704, 710, 428 N.E.2d 727; *People v. Corder* (1982), 103 Ill. App. 3d 434, 437, 431 N.E.2d 701; *People v. Scott* (1981), 94 Ill. App. 3d 159, 162-64, 418 N.E.2d 805.)[1] It is defendant's burden to establish clearly both that incompetency and the resultant prejudice. *People v. Berger* (1982), 109 Ill. App. 3d 1054, 1067.

In *Berger*, the court set out several factors to be considered in evaluating an attorney's competence. A defendant is entitled to competent, not perfect, representation; nor is a defendant entitled to a successful defense. Competency is determined from the totality of counsel's conduct at trial. Conduct which can be shown to be an exercise of judgment, discretion or trial strategy does not prove incompetency. Proof of prejudice cannot be based on mere conjecture. A defendant also may not rely on speculation as to the outcome of his case had the representation been of higher quality. Nor is the test what appellate counsel would have done at trial. (*People v. Berger* (1982), 109 Ill. App. 3d 1054, 1062.) With these principles in mind we turn to defendants' specific allegations of incompetence.

■ Defendants complain of their counsel's failure to call either Anthony or Larry Mayweather as witnesses, although both were named in the State's answer to discovery. Defendants, however, fail to suggest what testimony Anthony Mayweather could have given. With respect to Larry Mayweather, defendants' counsel, after trial, produced an affidavit of Denise Beasley in which she stated that Larry Mayweather had told her that he had witnessed the robbery and that defendant Martin was not one of the assailants. As the trial court correctly noted, this statement was obviously inadmissible hearsay. There was no affidavit from Mayweather. Whether Mayweather was available to testify at trial and would have testified as Beasley represented is entirely speculative. (See *People v. Greer* (1980), 79 Ill. 2d 103, 122, 402 N.E.2d 203.) Under the circumstances presented by this record, we cannot say that defense counsel's failure to call either Mayweather was evidence of incompetence.

Defendants' next allegation of incompetence concerns the testimony of Dwayne Beasley. On direct examination, Beasley, a defense

---

[1]Although defendants urge us to replace this standard with the "minimum standard of professional representation" test articulated in *United States ex rel. Williams v. Twomey* (7th Cir. 1975), 510 F.2d 634, our supreme court has repeatedly rejected that standard. (See, *e.g., People v. Greer* (1980), 79 Ill. 2d 103, 121, 402 N.E.2d 203.) We therefore decline defendants' invitation to adopt it.

witness, accused Perry Lewis of first selling his father a clock and a bottle of cologne and then stealing them. On cross-examination, Beasley admitted that he had no personal knowledge of this alleged conduct and the trial court disregarded his testimony on this matter. Defendants claim that this demonstrates that counsel either failed to interview Beasley properly or was unaware that his testimony was hearsay. We do not believe that these are the only two possible explanations but regardless of the reason that this particular attack on Lewis' credibility did not succeed, it falls far short of suggesting incompetence.

■ Defendants also point out that defense counsel failed to prove up the impeachment of Lena Mae Beasley and Perry Lewis. On cross-examination, defense counsel questioned Mrs. Beasley about prior inconsistent statements she purportedly made to the police in which she had described the young men at the elevator as being 15 to 18 years old. Her testimony on direct examination was that they were "in their twenties," which was the approximate age of defendants. In response to counsel's inquiry, Mrs. Beasley stated that she could not recall whether she had so described them but if she had, it was because she was very upset. Defense counsel did not prove that the witness gave an inconsistent statement, but we do not find that this is evidence of incompetence. Although the witness did not unequivocally admit that she had made the prior inconsistent statements, nothing in the record indicates that the court ignored this impeachment or doubted whether she had given an inconsistent statement. In closing arguments, which were notable for their extraordinary give and take between counsel and the court, defense counsel represented without correction by the court that the witness had told the police that the men she saw on January 27 were 15 to 18 years old. In any event, the failure to use available impeaching evidence relative to a witness' description does not constitute incompetence. (*People v. Nelson* (1982), 106 Ill. App. 3d 838, 844, 436 N.E.2d 655.) This is particularly true in the case at bar where the witness, Lena Mae Beasley, never identified either defendant. The identification of defendants was based entirely on the testimony of another witness, Perry Lewis, who had known both of them for several years.

On cross-examination, Perry Lewis denied that he used several aliases. Defendants argue that defense counsel's failure to introduce evidence contradicting Lewis' denial is indicative of incompetence. We cannot agree. Nothing in the record establishes that defense counsel had evidence that Lewis employed aliases. Moreover, even if counsel had such evidence, we question whether that evidence would have

been admissible (see *People v. Steptore* (1972), 51 Ill. 2d 208, 216-17, 281 N.E.2d 642 (regarding impeachment on collateral matters) or probative of Lewis' credibility (see *People v. Berlin* (1979), 75 Ill. 2d 266, 268, 388 N.E.2d 412 (regarding the innocuous use of aliases)).

Lewis also denied on cross-examination that he told the police that the crime occurred on the seventh, and not the 11th, floor of the 2145 building. The attempted impeachment was not perfected. In closing argument defense counsel referred to a police report in which Lewis allegedly said that the offense occurred on the seventh floor. At this point, the court interjected, "It may be just a technical point, but none of that impeachment was completed, was it?" Nothing in the court's question indicates that it was going to overlook the attempted impeachment. Counsel was permitted to continue with his argument and, after a few moments, returned to a discussion of what the police report said without further comment by the court. In our judgment, counsel's technical failure to perfect his impeachment on this matter does not necessarily reflect on his competence.

As further evidence of incompetence, defendants mention three instances during the cross-examination of defendant Martin and defense witness Dwayne Beasley when, without objection by defense counsel, the State was allowed to suggest matters for which there was no evidence. Failure to object, however, may have been a tactical decision which is not reviewable. (*People v. Greer* (1980), 79 Ill. 2d 103, 122, 402 N.E.2d 203.) Moreover, this was a bench trial and there is a presumption in a bench trial that the court considered only competent evidence. (*People v. Rodgers* (1978), 58 Ill. App. 3d 719, 724, 374 N.E.2d 721.) This presumption is not overcome unless the record affirmatively shows that the court actually relied on the objectionable evidence. (*People v. Conwell* (1978), 64 Ill. App. 3d 995, 1003, 382 N.E.2d 64.) No such showing has been made here. We have reviewed defendants' other allegations of incompetence and find that they are without merit.

The issue of competence of counsel must be determined from the entire record rather than from isolated instances in the trial. (*People v. Berger* (1982), 109 Ill. App. 3d 1054, 1067.) Upon our examination of that record, we cannot say that defendants were denied the effective assistance of counsel. Defense counsel vigorously and extensively cross-examined the State's witnesses, moved for directed findings, presented 12 witnesses in defense and gave detailed closing arguments and responded immediately and thoroughly to the court's inquiries during those arguments. Throughout the trial counsel manifested familiarity with all aspects of the case against their clients and capa-

bly, albeit unsuccessfully, defended them.

 To be entitled to a new trial on grounds of ineffective assistance of counsel, defendants must clearly establish both that counsel were actually incompetent as reflected in the performance of their duties as trial attorneys, and that this incompetence substantially prejudiced defendants such that the outcome of the trial was probably changed. In our judgment, defendants have shown neither incompetency nor the resultant prejudice. We therefore conclude that defendants are not entitled to a new trial.

## II

Defendants next contend that the State attacked the credibility of certain defense witnesses with repeated, unsupported insinuations that the witnesses' testimony was the product of threats and intimidation. The State initially responds that this issue has been waived since it was not raised in either defendant's motion for a new trial. While we could find that the issue has been waived, nevertheless we choose to address it.

 At trial, one of the prosecutors suggested to the court that the purpose of the defense in sending defendant Martin's brother to the home of Susan and Odessa Turner was not to transport them to court but to intimidate them into testifying for the defense. When defense counsel objected, the trial judge stated that he was not likely to be inflamed by remarks of either counsel. Obviously the court was not affected by the prosecutor's suggestion. Prior to Perry Lewis testifying, the prosecutor argued that the presence of the defendants' families in the courtroom was a subtle form of intimidation of the witness. Again defense counsel objected and the court said: "Without going into [a]llusions, if the request is simply that since there is room and everybody is sitting on the other side of the courtroom, these people should as well, I think that is appropriate and I will so ask." Nothing in the court's answer indicates that it was improperly influenced by the prosecutor's comments. After Lewis testified, the prosecutor asked that he be allowed to leave the courtroom and the building immediately "because of the threats and his own family's fears." The court granted this request, stating that "[t]here is at least a colorable claim of his concern for himself in that he wants to get out of here, ***." In light of Lewis' testimony that both defendant Martin and his brother threatened him, we find nothing objectionable either in the prosecutor's request or in the court's response.

The major portion of defendants' second argument is devoted to the State's cross-examination of Susie Turner, Perry Lewis' aunt, who

testified on direct examination that Lewis admitted to her that he had lied in naming Martin as one of the offenders. Mrs. Turner initially refused to relate the substance of that conversation, explaining that she had been threatened. Defense counsel declined the court's invitation to inquire further about any threats to the witness and this became an area of the State's cross-examination.

Mrs. Turner stated that she knew that members of defendants' families were present in court as she was testifying and was aware that they lived in her building. Several relatives of defendants spoke with her before she took the stand. She stated that she had feared to testify because she had been threatened, but was not afraid to return to her apartment since she had testified that "Red [defendant Martin] didn't do it." On further cross-examination, Mrs. Turner admitted that she had not wanted to give a statement to anybody because she was afraid. She concluded her testimony saying, "Either way it go, I am afraid." In our opinion the State's cross-examination was not improper.

■ The attempted intimidation of a witness in a criminal case is properly attributable to a consciousness of guilt and is thus relevant. (*People v. Jones* (1980), 82 Ill. App. 3d 386, 393, 402 N.E.2d 746.) It was brought out on direct examination that Mrs. Turner had been threatened and the State was well within the bounds of permissible cross-examination to explore the source of those threats. Defendants, however, argue that although the State failed to prove who had threatened Mrs. Turner, it succeeded in insinuating to the court that it was the defendants. Defendants refer us to a comment the court made during closing argument, but we do not find that the comment, in context, supports defendants' argument.

Defense counsel's theory at trial was that Perry Lewis had implicated the defendants to avoid being charged himself. In developing this theory in closing argument, counsel posed the rhetorical question, why would Susie Turner lie. The court interjected:

> "No, let's not get onto Susie Turner for a moment. Even assuming what you are saying is true [that Lewis had falsely accused the defendants], why would he [Lewis] go back to 2145 West Lake Street where apparently on sight and with justification he could believe that any number or any large number of people would see him, would at least jump on him and beat him up."

■ The court's remarks were clearly addressed to the reasonableness of defendants' theory that Lewis had "framed" the defendants and did not even remotely reflect a belief on the court's part that

defendants or their families had threatened or intimidated Susan Turner. Defendants have failed to show that they were prejudiced by the prosecutor's comments or by his cross-examination of Mrs. Turner.

## III

Defendants next contend that they were not proved guilty beyond a reasonable doubt. Specifically, defendants argue that there was insufficient evidence that defendants' acts caused the victim's death and that the testimony of the sole occurrence witness, Perry Lewis, was unworthy of belief.

In a criminal trial, the State bears the burden of proving beyond a reasonable doubt all the material and essential facts constituting a crime. (*People v. Weinstein* (1966), 35 Ill. 2d 467, 470, 220 N.E.2d 432.) In a murder prosecution, those facts are proof of death and proof of a criminal agency causing death. (*People v. Benson* (1960), 19 Ill. 2d 50, 58, 166 N.E.2d 80.) The State, however, is not required to prove that a defendant's acts constituted the sole and immediate cause of death. It is sufficient that the State establish that those acts constituted a contributory cause such that the death did not result from a source unconnected with those acts. (*People v. Schreiber* (1982), 104 Ill. App. 3d 618, 625, 432 N.E.2d 1316; *People v. Brown* (1978), 57 Ill. App. 3d 528, 531, 373 N.E.2d 459.) In our judgment, the State has met this burden.

The pathologist, Dr. Donoghue, testified that the cause of Joshua Beasley's death was "arteriosclerotic cardiovascular disease secondary to the beating." By "secondary to the beating," he meant that Beasley had very severe heart disease and the beating placed such a strain on his heart that he died. Evidence similar to this has been held sufficient to establish criminal agency. (*People v. Schreiber* (1982), 104 Ill. App. 3d 618, 624-25, 432 N.E.2d 1316; *People v. Cunningham* (1902), 195 Ill. 550, 63 N.E. 517.) The fact that a person without the deceased's history of heart disease probably would have survived the attack is immaterial. *People v. Humble* (1974), 18 Ill. App. 3d 446, 449-50, 310 N.E.2d 51.

Defendants, however, point out that based on his autopsy examination alone, Dr. Donoghue could not exclude the possibility that the victim's death was caused by some stress independent of the beating. The testimony of Lena Mae Beasley and Perry Lewis, however, established that the victim was alive before and during the assault. The only reasonable inference that can be drawn from their testimony is that the stress of the beating did in fact trigger the heart failure. This

was also the opinion of Dr. Donoghue who testified that the beating "definitely aggravated" Beasley's heart condition and "caused his death at this time."

▮ The determination of whether there was a casual relationship between the defendants' conduct and the decedent's death is a matter properly left to the trier of fact. (*People v. Dillon* (1975), 28 Ill. App. 3d 11, 18, 327 N.E.2d 225.) The trial court found that the beating inflicted upon Joshua Beasley caused his death. On the basis of the evidence presented, we cannot say that this finding was erroneous. The State proved beyond a reasonable doubt that the victim's death was the result of criminal acts.

▮ Defendants argue that their convictions for murder and armed robbery must be reversed because they rest on the uncorroborated and uncontradicted testimony of a single witness, Perry Lewis, who only identified defendants as the offenders after he had been arrested and advised of his rights. We have carefully examined the evidence on which defendants rely and find that defendants' argument merely raises questions of credibility which, in a bench trial, were within the province of the trial judge to decide. (*People v. Glaze* (1977), 48 Ill. App. 3d 523, 532, 362 N.E.2d 1287.) The testimony of a single witness, if positive and credible, is sufficient to sustain a conviction even though the testimony is contradicted by the accused. (*People v. Carr* (1973), 16 Ill. App. 3d 76, 78, 305 N.E.2d 554.) Where, as here, the evidence is merely conflicting, a court of review will not substitute its judgment for that of the trier of fact. (*People v. Akis* (1976), 63 Ill. 2d 296, 298-99, 347 N.E.2d 733.) In the instant case the trial court apparently believed the testimony of Perry Lewis and rejected the alibi presented by defendants. We cannot say that these determinations were in error. Accordingly, the defendants' convictions will not be reversed for insufficiency.

## IV

Defendants next contend that the trial court abused its discretion in refusing to grant them a new trial. The basis of defendants' motion for a new trial was newly discovered evidence. In support of their motion, defendants attached the affidavits of George Adams, a security guard at the 2145 building, Aaron Beasley and Denise Beasley. George Adams alleged in his affidavit that sometime after the attack upon Joshua Beasley, he heard Perry Lewis brag that he (Lewis) had committed the offense himself. Aaron Beasley stated that the gold wedding band marked as Defense Exhibit No. 3 was indeed his father's ring. Denise Beasley denied that the deceased was wearing a

birthstone ring on the day that he died and claimed that no one had given her sister, Vanessa Beasley, a birthstone ring on January 27, 1980.

Motions for a new trial on the ground of newly discovered evidence are not looked upon with favor by the courts and, in order to prevent fraud and imposition on the part of the defeated party, should always be subjected to the closest scrutiny by the court. (*People v. Reese* (1973), 54 Ill. 2d 51, 59, 294 N.E.2d 288.) To entitle a defendant to a new trial, newly discovered evidence must meet the following standards: it must be conclusive and likely to change the result upon retrial; it must be material and noncumulative; it must have been discovered after the trial; and it must be of such character that it could not have been discovered before trial by the exercise of due diligence. (*People v. Ramos* (1980), 80 Ill. App. 3d 722, 725, 400 N.E.2d 676.) Newly discovered evidence which only has the effect of impeaching, discrediting or contradicting a witness does not afford a basis for a new trial. *People v. Carpenter* (1979), 74 Ill. App. 3d 770, 774, 393 N.E.2d 50, citing *People v. Holtzman* (1953), 1 Ill. 2d 562, 568, 116 N.E.2d 338.

The averments in the affidavits of Aaron and Denise Beasley are merely cumulative of evidence presented at trial and could not be regarded as conclusive on any issue. Turning to the affidavit of George Adams, we note that defense counsel initially made a tactical decision to proceed to trial without George Adams because counsel believed that there was enough evidence without Adams' testimony to raise a reasonable doubt of the defendants' guilt. Defense counsel was aware of what testimony Adams purportedly could have given but did not seek a continuance in order to locate him. Given these circumstances, the trial court ruled that defense counsel failed to exercise due diligence in discovering the evidence provided by George Adams. We cannot say that this determination was in error.

• A motion for a new trial on the ground of newly discovered evidence is addressed to the discretion of the trial judge and denial thereof will not be disturbed upon review in the absence of a showing of a manifest abuse of that discretion. (*People v. Miller* (1980), 79 Ill. 2d 454, 462, 404 N.E.2d 199; *People v. Reese* (1973), 54 Ill. 2d 51, 59, 294 N.E.2d 288.) No such showing has been made, and we find no error in the trial court's denial of defendants' motion for a new trial.

## V

Defendants next contend that the trial court abused its discretion in sentencing defendants to 30-year sentences for murder. Defendants

maintain that these sentences are excessive and that the minimum sentence of 20 years would be more appropriate given the defendants' "youth and exemplary backgrounds" and their potential for rehabilitation. Defendants also argue that the court placed undue weight on the need for deterrence and improperly considered the fact of the victim's death as a factor aggravating defendants' convictions for murder.

Our courts have frequently stated that the trial judge is in a better position to determine the punishment to be imposed than the courts of review. (See, *e.g., People v. Butler* (1976), 64 Ill. 2d 485, 490, 356 N.E.2d 330.) A reasoned judgment as to the proper sentence to be imposed must be based upon the particular circumstances of each individual case. (*People v. Bolyard* (1975), 61 Ill. 2d 583, 589, 338 N.E.2d 168.) This judgment depends upon many factors, including the defendant's credibility, demeanor, general moral character, mentality, social environment, habits and age. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882.) The trial judge, in the course of the trial and the sentencing hearing, has an opportunity to consider these factors which is superior to that afforded by the cold record in this court. (*Perruquet.*) Accordingly, "the trial judge's decisions in regard to sentencing are entitled to great deference and weight," and, "absent an abuse of discretion *** a sentence may not be altered upon review." *People v. La Pointe* (1981), 88 Ill. 2d 482, 492-93, 431 N.E.2d 344, quoting *People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882.

Initially, we must point out that the trial court specifically declined to impose either consecutive sentences or extended term sentences. And the court did not impose the maximum sentence for murder (40 years) "primarily because of the prior good record of these defendants, ***." Among the factors in mitigation, the court placed principal emphasis on the "absence of any prior record of convictions," stating that "in each case that is a very significant fact." The court also mentioned "the mitigating factors of employment ***." It is apparent from these and other remarks at the sentencing hearing that in selecting an appropriate sentence, the trial court did take into account the age, employment history and absence of a criminal record of each defendant. The court, however, found that a minimum sentence was inappropriate "because of the viciousness of the actions which occurred, ***." The court elaborated:

> "This was a beating for sport, he was beaten for the fun of being beaten, and he was beaten to death.
>
> It was not a beating as part of or a necessary part of the other unlawful end of the armed robbery. Apparently, at some

point it took on its own end to simply beat Joshua Beasley because he was there and handy, and it was fun to do to beat this old man down to his knees and leave him in the kind of condition he was in as he crawled away from the puddle of blood outside the elevator, a puddle of blood brought about not by any deep wound, but a puddle of blood caused by extensive bleedings from superficial wounds, wounds around the face and head and the like, which is an indication of just how badly he was beaten to leave that much blood."

The record amply demonstrates that defendants received sentences in excess of the minimum for murder because of the "vicious, senseless, unprovoked beating" they inflicted upon the deceased. Moreover, we do not find that the court gave "undue weight" to the need for deterrence. The court stated that defendants had to be punished both in consideration of the effect of punishment upon them and as deterrence to others. The court explained:

"I don't know to what extent it would make any difference, but the Court has to do at least its part in getting the message across that it's not open season on the Joshua Beasleys of this world and the Taylor homes or in any other housing projects, wherever they may be, but they are citizens and entitled to the same protections we all enjoy."

We find no error in this. Nor do we find any error in the court's reference to "the aggravating factor which was previously pointed out of the matter of the death of Mr. Beasley." We have recently stated that "[i]t is unrealistic to suggest that the judge sentencing a convicted murderer must avoid mentioning the fact that someone has died or risk committing reversible error." *People v. Barney* (1982), 111 Ill. App. 3d 669, 679.

The apparent thrust of defendants' argument is that no sentence in excess of the minimum may be imposed unless an aggravating factor not implicit in the crime itself is present. Since, according to defendants, there were no aggravating factors here, the trial court's sentences for murder are excessive. While our previous examination of the trial court's comments at the sentencing hearing leaves no doubt that there was an aggravating factor (see *People v. Warfel* (1979), 67 Ill. App. 3d 620, 625-26, 385 N.E.2d 175), we also believe the premise of defendants' argument is erroneous.

●■ ■ We have recently observed that the Code of Corrections "imposes no requirement that the minimum sentence be imposed in the absence of aggravating factors." (*People v. Barney* (1982), 111 Ill. App. 3d 669, 679.) After a careful analysis of the Code of Corrections,

we concluded that "a sentence not in excess of the maximum authorized may be imposed in the absence of such aggravating factors." (111 Ill. App. 3d 669, 680.) While it is improper to impose a sentence more severe than the sentence that would have been imposed if the impermissible factor had not been considered (*People v. Conover* (1981), 84 Ill. 2d 400, 419 N.E.2d 906), we do not find that an impermissible factor was considered here. Defendants have failed to show that the trial court abused its discretion in sentencing them to 30 years' imprisonment for the crime of murder.

## VI

Defendants' final contention is that they were improperly convicted and sentenced for three counts of murder and one count of armed robbery which arose out of the same physical acts. Defendants also contend that the armed robbery convictions and sentences must be vacated because armed robbery is a lesser included offense of the felony-murder conviction.

Defendants were indicted on three counts of murder (Ill. Rev. Stat. 1977, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3)) and one count of armed robbery. They were found guilty on each count and judgment was entered on each count. In sentencing defendants, the trial court stated: "I'm going to impose on each of these defendants upon their conviction [not convictions] of murder, which is to the Department of Corrections for a period of thirty years ***." The mittimus indicates that each defendant was sentenced to a single 30 year term on all three convictions. In our judgment, the trial court imposed one 30-year sentence for murder on each defendant, not three 30-year sentences, as defendants represent.

Since there was only one victim, only one murder conviction is appropriate. (*People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838.) Where multiple convictions have been entered erroneously, the less serious or "included" offense(s) will be vacated. (*People v. Whitaker* (1980), 87 Ill. App. 3d 563, 566, 410 N.E.2d 166.) The Criminal Code defines an "included" offense as one which is established by proof of a less culpable mental state than that which is required to establish the commission of another crime charged. Ill. Rev. Stat. 1979, ch. 38, par. 2—9(a).

Here, defendants' three murder convictions are equally serious Class X offenses. Of the three, however, the most culpable mental state is that which is required for a conviction of "intentional" murder under subsection (a)(1), which requires proof of a defendant's "actual intent" to kill or do great bodily harm. By comparison, subsection

(a)(2) requires proof that a defendant "know" that his acts create a "strong probability" of death or great bodily harm. Felony-murder (subsection (a)(3)) is an "implied intent" offense. A person may be convicted of felony-murder "whether the killing *** is intentional or accidental, or is committed by a confederate without the connivance of the defendant." (Ill. Ann. Stat., ch. 38, par. 9—1, Committee Comments, at 16 (Smith-Hurd 1979).) For purposes of felony (armed robbery) murder, there is no requirement that the State prove a mental state element for the underlying offense. (*People v. Hawkins* (1973), 14 Ill. App. 3d 549, 551, 302 N.E.2d 128.) Thus, no mental state element as such need be proved to obtain the felony-murder conviction. (*People v. Gulliford* (1980), 86 Ill. App. 3d 237, 244, 407 N.E.2d 1094.) The defendant is held strictly liable for felony-murder upon proof of armed robbery. By contrast, in order to obtain a conviction under the first classification of murder as defined in Illinois, the State is required to prove beyond a reasonable doubt that the defendant intended "to kill or do great bodily harm," or knew that his acts would cause death. To obtain a conviction under the second classification, the State must prove that the defendant knew that his acts "created a strong probability of death or great bodily harm."

●■ The mental state element in subsection (a)(1) renders more culpable a subsection (a)(1) offense than a subsection (a)(2) offense. And both are most culpable than a subsection (a)(3) offense for which no mental state element exists. Thus, it appears that on the basis of criminal culpability, the defendants' felony (armed robbery) murder convictions under subsection (a)(3) and their convictions under (a)(2) are "included" offenses of their convictions under subsection (a)(1) and must therefore be vacated. See *People v. Bone* (1982), 103 Ill. App. 3d 1066, 1068-69, 432 N.E.2d 329 (of defendant's two murder convictions under subsections (a)(2) and (a)(3), the appellate court vacated the (a)(3) conviction); *People v. Robinson* (1969), 106 Ill. App. 2d 78, 86-87, 246 N.E.2d 15 (of defendant's two murder convictions under subsections (a)(1) and (a)(2), the appellate court vacated the (a)(2) conviction); *People v. Brownell* (1980), 79 Ill. 2d 508, 514, 404 N.E.2d 181 (of defendant's two murder convictions under subsections (a)(1) and (a)(3), the trial court vacated the (a)(3) conviction).

Our vacation of defendants' convictions under subsections (a)(2) and (a)(3) makes it unnecessary to reach defendants' contention that the armed robbery convictions must be vacated as lesser included offenses of the felony-murder convictions. But see *People v. Miller* (1980), 89 Ill. App. 3d 973, 979, 412 N.E.2d 175; *People v. Gulliford*

(1980), 86 Ill. App. 3d 237, 407 N.E.2d 1094 (armed robbery is not a lesser included offense of felony-murder).

We do not find that it is necessary to remand the cause for resentencing on either the defendants' convictions for murder under subsection (a)(1) or for armed robbery. Defendants' argument in favor of remandment assumes that defendants' sentences in excess of the minimum are explainable only by reference to the fact that there were multiple convictions for murder. For the reasons set forth previously (Part V), we disagree and therefore decline to remand for resentencing.

For the foregoing reasons, we affirm the defendants' convictions and sentences for armed robbery and for murder under the first count of the indictment (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(a)(1)) and vacate the convictions for murder under the second and third counts of the indictment (Ill. Rev. Stat. 1977, ch. 38, pars. 9—1(a)(2) and (a)(3)).

Affirmed in part and vacated in part.

DOWNING, P.J., and STAMOS, J., concur.