THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ENRIQUE BORGES, Defendant-Appellant.

First District (2nd Division)   No. 83—174

Opinion filed September 18, 1984.

Steven Clark and Phillip J. Zisook, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Jeanette Sublett, and William G. Lacy, Assistant State's Attorneys, of counsel), for the People.

JUSTICE PERLIN delivered the opinion of the court:

Enrique Borges (defendant) was indicted for murder (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(1)) and conspiracy to commit murder (Ill. Rev. Stat. 1981, ch. 38, par. 8—2). He and a codefendant, Danilo Ruiz, were tried simultaneously before separate juries. Ruiz was acquitted. Defendant was convicted of murder and acquitted on the conspiracy charge, following which he was sentenced to 30 years for murder.

At defendant's trial, Chicago police officer John Klusman testified that at about 1:55 a.m. on January 30, 1982, he arrived at the intersection of Hirsch and Maplewood streets in Chicago and found a young man lying in a pool of blood. While at the scene, Klusman spoke with Sergio Rodrigues and Larry Taylor, with whom the victim had been walking.

Armando Ochoa testified: he was at the time of defendant's trial living in the protective custody division of the Cook County jail. He was testifying in exchange for the State's dropping charges against him in the instant case and agreeing to recommend a three-year sentence on the remaining conspiracy-to-commit-murder charge still pending against Ochoa. Prior to the shooting, Ochoa, a member of the Puerto Rican Stones street gang, was attending a party at a house on Sheffield Avenue. Also in attendance were members of the Latin Kings, Spanish Lords and Insane Unknown street gangs. Ochoa testified that these four gangs were "allies" in a "war" with the rival gangs Latin Eagles, Latin Disciples, Imperial Gangsters and Spanish Cobras.

Ochoa testified that Borges was at the party in the company of codefendant Ruiz. Ochoa heard Ruiz tell another member of the Insane Unknowns that Ruiz wanted to kill some members of the rival Disciples gang, and that he (Ruiz) had a shotgun. At about 12:30 a.m., Ochoa left the party with Messrs. Ruiz, Borges, Rivera, Chapman and Perez to buy some marijuana. Ochoa drove his blue Omega, with

Borges sitting in the front passenger seat and Perez in the rear. The other persons were in Chapman's black Trans-Am auto. Ochoa followed behind Chapman's car.

While driving, Ochoa saw three men at the intersection of Hirsch and Maplewood. After Chapman's car crossed, the three men walked through the intersection. Perez then rolled the rear window down, and Ochoa heard gunshots fired from the rear of his car. He then saw Borges draw a "long revolver" and fire three shots toward the three pedestrians. Ochoa did not see any of the men fall.

Ochoa then drove back to the party. During the drive back, Borges stated that if they ran into any police, he wanted to "shoot it out." Borges told Ochoa that his gun was a Colt .45; Perez said his was a .9 millimeter. Borges stated that he was going to hide his gun under the dashboard of Ochoa's car. Back at the party Ochoa heard Ruiz asking people if they wanted to buy a Colt gun.

Ochoa testified that he was arrested by the police for murder in connection with this incident on February 14, 1982. Since February 16, he had been living in the protective custody quarters of the Cook County jail. Although Rivera was in the same quarters, the two of them did not discuss their court testimony.

Jose Rivera testified for the State: he was a member of the Puerto Rican Stones gang. At the time of the trial, charges for conspiracy to commit murder, murder and concealing a homicide, arising from this incident, were pending against him. At the time of trial he was living in the protective custody unit of the Cook County jail. Although he and Ochoa were incarcerated in the same unit, they did not discuss this case because Rivera was in the lockup.

At the January 29 party, Rivera heard Ruiz tell Chapman that Ruiz wanted to "burn" some members of the Latin Disciples gang. Chapman told Ruiz, "Later." Rivera left the party with the others to buy marijuana. Borges, Perez and Ochoa rode in Ochoa's car; Ruiz, Rivera and Chapman were in Chapman's car. While they were driving, Ruiz began "playing" with a shotgun in the back seat of Chapman's car.

At the intersection of Hirsch and Maplewood, Rivera saw three men make hand gestures indicating they were members of the rival Latin Disciples gang. Chapman drove the car slowly through the intersection. The three pedestrians crossed the intersection in front of Ochoa's following car. Rivera saw "fire" come from the passenger side of Ochoa's car, and one of the men in the intersection fell. Chapman drove his car around the block and approached the three men. Chapman parked the car near the fallen man, and Ruiz and Chapman

then fired at the man from four or five feet away. Ruiz shot twice and Chapman shot six times. They then drove back to the party. At the party, Ruiz advised people that he had a Colt .45 for sale.

Rivera testified that when he found he was wanted by the police in connection with the shooting, he turned himself in. He was interviewed by the police for three days. He stated that he reached an agreement with the State that in return for his testimony before the grand jury and at trial, the State would drop the murder charge against him and recommend a three-year sentence for the charge of concealing a homicide. Rivera testified that in 1981 he had been sentenced to one year probation for misdemeanor theft.

Dr. Rae An, a forensic pathologist for the county, testified that she had performed the autopsy on the victim, James Harrison, and that the cause of death was one of four bullet wounds in the body.

Sergio Rodrigues testified: On the night of the shooting, he and two friends were walking near the intersection of Maplewood and Hirsch streets when he noticed a blue car parked under a streetlight. The window on the front passenger's side of the car opened. Borges stuck out his head, and was holding a pistol. Rodrigues told his friends to run. Gunfire came from the car. Rodrigues saw Borges fire two shots at the men. After a few more shots, the car drove off. Rodrigues stated that he then saw a second car, a black and yellow Camaro, drive by. From that car Ruiz fired three shots. Rodrigues testified that he heard the driver of the second car say, "We got them suckers." Rodrigues said that the black and yellow car had not been traveling in front of the blue car.

Rodrigues further testified that two weeks after the trial, he had identified Borges and Ruiz at a police lineup as the persons firing the shots. At trial Rodrigues identified pictures of the lineup. He was a member of the Latin Disciples, and he had pleaded guilty to armed robbery in 1973 and to delivery of a controlled substance in 1975. At the time of trial, Rodrigues had pending against him an unlawful-use-of-weapons charge, and he was on probation for battery. He denied entering into any agreement with the State in return for his testimony. On the night of the shooting, he had drunk approximately 1½ quarts of beer.

Chicago police detective Nick Gaudio testified that he was present on February 14, when the lineup which included defendants Ruiz and Borges was held. While there was a height disparity between the lineup subjects, it was not obvious, because the subjects were seated when viewed by witnesses.

On Borges' behalf, defense counsel presented three of defendant's

family members and a family friend who testified that on the night of January 30, 1982, defendant and the others drove to Waukegan to watch a televised boxing match and thereafter defendant returned home and went to bed.

In rebuttal, the State offered the testimony of Officer Klusman, who stated that the murder had occurred in the *early morning hours* of January 30 and *not on the night* of January 30.

In closing arguments the prosecutor told the jury he did not know why defendant introduced testimony of his whereabouts on the night following the murder. In his closing argument, defense counsel told the jury that he was not presenting an alibi defense, and admitted defendant was not visiting in Waukegan on the night of the shooting. "It is an error I made. I ask you not to hold it against Ricky Borges." In rebuttal, the State argued that the evidence of defendant's whereabouts on the night before the murder "was no mistake" and that the defense was "trying to fool you." The jury returned verdicts of guilty on both murder and conspiracy to commit murder. The trial judge vacated the conspiracy verdict and sentenced defendant to 30 years for murder.

■ On appeal, defendant contends that he received ineffective assistance of counsel when his attorney presented four alibi witnesses for the wrong night, and defendant is therefore entitled to a new trial. The State responds that under the totality of the circumstances defendant received adequate assistance of counsel, and his conviction should be affirmed.

In *Strickland v. Washington* (1984), 466 U.S. ___, ___, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064, the United States Supreme Court held:

> "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable."

Our Illinois supreme court has enunciated a similar standard. (*People*

*v. Royse* (1983), 99 Ill. 2d 163, 457 N.E.2d 1217.) We recognize that in analyzing a defense counsel's trial performance, we must examine the record as a whole, rather than focusing on isolated incidents (*People v. Martin* (1983), 112 Ill. App. 3d 486, 445 N.E.2d 795), and that appellate review will not extend to those areas of representation which involve the exercise of judgment, trial tactics and strategy (*People v. Gallardo* (1983), 112 Ill. App. 3d 764, 445 N.E.2d 1213). We are aware that the United States Supreme Court has advised that "[j]udicial scrutiny of counsel's performance must be highly deferential." (*Strickland v. Washington* (1984), 466 U.S. ___, ___, 80 L. Ed. 2d 674, 694, 104 S. Ct. 2052, 2065.) It is our opinion, however, that none of these admonishments can deflect a conclusion that defense counsel's introduction of testimony from four witnesses to the effect that defendant was in another city on the night *before* the crime was, in fact, "actual incompetence" and a "deficient" performance.

Such a determination does not end our inquiry. To obtain a new trial after a finding that defendant's counsel was actually incompetent, "the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction *** resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland v. Washington* (1984), 466 U.S. ___, ___, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.

The *Strickland* court defined the "prejudice" which a defendant must show in order to prevail on his claim as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (466 U.S. ___, ___, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068.) The Illinois Supreme Court has stated that the standard for determining whether counsel's incompetence requires a new trial is whether such errors "produced substantial prejudice to the defendant without which the result of the trial would probably have been different." (*People v. Greer* (1980), 79 Ill. 2d 103, 120-21, 402 N.E.2d 203.) The prejudice allegedly suffered by a defendant cannot be based on speculation or mere conjecture. *People v. Hills* (1980), 78 Ill. 2d 500, 401 N.E.2d 523.

In our opinion, it cannot be said that in the absence of the alibi testimony for the wrong date, "the result" of the defendant's trial "would have been" or "probably" would be "different." As was rec-

ognized by defendant's counsel, this case centered upon the identification of defendant by the witnesses. We note that counsel did an able job in cross-examining the eyewitnesses who identified the defendant. Counsel also presented cogent, articulate arguments to the jury as to why the identification evidence against defendant Borges should not be relied upon.

In urging that defense counsel's incompetence prejudiced him, defendant relies heavily on *United States ex rel. Connor v. Lane* (N.D. Ill. March 18, 1983), No. 81 C 2527. In that case defendant's attorney presented a witness who testified to an alibi for the day *after* the crime. When the witness testified to the wrong date, defense counsel attempted, unsuccessfully, to have the witness, while on the stand, amend his testimony to establish an alibi for the correct date. The Federal court found that the presentation of such testimony was incompetence and, further, that defendant was prejudiced thereby, requiring a new trial. The court's holding was based on its finding that the State presented the testimony of only one of the two victims of the crime and that that person was a 16-year-old who "gave a very general description of her assailants, after the event." Also, she identified a picture of the defendant by saying it looked "something like" the perpetrator. The court found that the "state's case rested almost entirely on the testimony of one witness whose identification at trial was at least suspect" and that "the only other evidence apparently connecting [the defendant] with the crime was the fact that his residence was one block away from the scene of the crime." The court concluded that in light of these circumstances and the fact that defense counsel in his opening statement advised the jury he would present an alibi defense, defense counsel's error "had a devastating effect" on defendant's case in that it "utterly destroyed the credibility of petitioner's defense" and undercut counsel's "entire position that there was reasonable doubt as to the identification of the [defendant] by the victim."

We find substantially different circumstances attendant in the instant case. Here, the State's witnesses to the crime presented very strong identification testimony against defendant. Defense counsel recognized that identification was the key issue and ably attacked the testimony and credibility of the identification witnesses. Defense counsel here did not advise the jury in his opening statement that defendant would present an alibi defense, and, when it became clear that the alibi witnesses testified as to the wrong date, counsel told the jury that the mistake in dates was "his error" and asked that they not hold it against defendant. In light of the strong evidence against

defendant, we cannot conclude that but for counsel's alibi error the outcome of defendant's trial would probably have been different. We therefore reject defendant's argument that he is entitled to a new trial based on the incompetence of his counsel.

Defendant also contends that his trial counsel was incompetent because he failed to move to suppress Rodrigues' pretrial lineup identification of Borges, and because he failed to impeach Rivera with Rivera's prior conviction for unlawful use of weapons. We do not find any incompetence based on these allegations.

■ As to the failure to move to suppress Rodrigues' pretrial identification of defendant, it has been repeatedly held that the decision not to move to suppress evidence is one involving trial strategy and therefore outside the scope of review for purposes of establishing incompetency of counsel. (*People v. Reppa* (1982), 104 Ill. App. 3d 1123, 433 N.E.2d 1091; *People v. Son* (1982), 111 Ill. App. 3d 273, 443 N.E.2d 1115.) Further, our review of the record indicates no basis to successfully move to suppress Rodrigues' identification.

■ With regard to the failure of defense counsel to impeach Rivera with the stipulation that he had previously pleaded guilty to a misdemeanor UUW conviction, the failure to use impeaching evidence has been held not to establish incompetence of counsel. (*People v. Martin* (1983), 112 Ill. App. 3d 486, 445 N.E.2d 795.) And while it is true that defense counsel neglected to impeach Rivera with this one conviction, he did in fact impeach Rivera with another prior conviction, as well as attacking his credibility based on Rivera's receiving leniency in return for his trial testimony. We find no incompetence based on these two allegations.

■ Defendant next argues that he was not proved guilty beyond a reasonable doubt because "the state's evidence consisted of substantially uncorroborated accomplice testimony motivated by promises of leniency and given by gang members with prior criminal backgrounds." He points out that Rivera was initially charged with the same crime, was testifying in return for leniency and, allegedly, lied on the witness stand. Ochoa was also charged with the murder and testified in return for leniency. Rodrigues was, at the time of trial, on probation, had pending criminal charges against him in an unrelated matter and had a previous criminal record. Rodrigues also testified that he was a member of a gang which, according to another witness, had been "at war" with Borges' gang at the time of the shooting.

Defendant also points to inconsistencies in the trial testimony which he asserts further indicate that he was not proved guilty beyond a reasonable doubt. He cites the fact that while Ochoa testified

that Chapman's car was in front of Ochoa's car and both cars were moving at the time of the initial shooting, Rodrigues testified that Chapman's car was parked at the time of the shooting and no other car was in the vicinity. While Rodrigues testified that defendant fired the first shots, Ochoa testified that one Juan Perez fired first.

The State responds that the evidence supports the jury's decision that defendant was proved guilty beyond a reasonable doubt; it is the function of the trier of fact to both determine the credibility of witnesses and reconcile conflicting testimony. The State posits that minor inconsistencies, such as those articulated by defendant, are insufficient to raise a reasonable doubt as to defendant's guilt. The State also contends that this case does not rely solely on the uncorroborated testimony of an accomplice and, under all of the circumstances, the defendant's guilt should be upheld.

In our opinion the record discloses sufficient evidence upon which to affirm defendant's guilt. While it is true that a conviction cannot be based solely on the uncorroborated testimony of an accomplice promised leniency in return for his testimony unless such testimony carries within it an "absolute conviction of its truth" (*People v. Ash* (1984), 102 Ill. 2d 485), that situation is not present here. The testimony presented against defendant was not solely that of accomplices, nor was it uncorroborated.

Nor do we believe the backgrounds of the witnesses arrayed against defendant, or the minor inconsistencies in their testimony, serve to cast doubt on defendant's guilt.

> "It is the function of the trier of fact to weigh the testimony, judge the credibility of the witnesses and determine factual matters in debatable circumstances, and in criminal proceedings, the trier of fact may believe part of a witness' testimony without believing all of it. [Citation.] A reviewing court has neither the duty nor the privilege to substitute its judgment as to the weight of disputed evidence or credibility of witnesses for that of the trier of fact ***. While there are a few minor contradictions as to his precise location at the moment of the shooting, there are many significant details which remain consistent in the witness' testimony ***." (*People v. Sanchez* (1982), 105 Ill. App. 3d 488, 493, 434 N.E.2d 395.)

While it is true that the State's witnesses to the shooting were not of impeccable character, there is no requirement that they be so. It is, again, the function of the trier of fact to determine their credibility. The record discloses no basis for overturning the jury's determination.

■■ Defendant next argues that he was denied a fair trial and due

process of law because the State allegedly allowed false testimony by one of its witnesses to go uncorrected. He contends that Rivera twice lied on the witness stand, once when he stated that he had complied with the terms of his court probation and a second time when Rivera testified that he was living in the protective-custody section of the Cook County jail.

With regard to the first statement, the record demonstrates that during his cross-examination and after acknowledging that he had been on probation, Rivera answered that he had complied with the terms of the probation. In a sidebar conference, it was shown that while on probation, Rivera had pleaded guilty to misdemeanor unlawful possession of a weapon. The record indicates that defense counsel was aware of Rivera's guilty plea. The State advised that no charges had been filed for violation of probation. After the sidebar, the parties stipulated that while on probation Rivera had pleaded guilty to the UUW charge.

We find no knowing use of false testimony by the State. Both the State and defense counsel were clearly aware of these facts and stipulated to them. Rivera's answer to the question was, arguably, untrue in that while his UUW conviction demonstrates he did not "comply" with the terms of probation, no legal proceedings were initiated. In any case, we find no use of false testimony by the State.

Defendant contends Rivera also lied when he stated that he was living in the protective-custody section of the Cook County jail. The testimony involved proceeded as follows:

"Defense Attorney: Where do you live now?

Rivera: At the protective custody.

Q. Where is that?

A. 2650 California."

After his testimony, the State advised defense counsel that Rivera was living instead at the protective custody unit of the Du Page County jail. Rivera had been moved due to allegations that he possessed marijuana while at Cook County. No charges were filed against Rivera based on these allegations. While it is clear that the State may neither use false testimony nor allow it to go uncorrected (*Napue v. Illinois* (1959), 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173), we do not believe such occurred here. The State advised defense counsel of Rivera's true residence. Defense counsel chose not to recall Rivera to impeach him. While we will not countenance the State using or permitting the use of false testimony, we do not believe the rule requires the State to immediately interrupt opposing counsel in order to correct what may be a misstatement or incorrect answer by a witness.

■ Defendant's final contention is that he was denied a fair trial when the State was allowed to introduce a witness' prior consistent statement in order to bolster his in-court testimony.

The record demonstrates that after Ochoa testified that defendant fired his gun at the victim, Ochoa was permitted, over defendant's objection, to testify that his courtroom testimony was the same as his pretrial statement to the authorities. While recognizing the rule that prohibits introduction of a prior consistent statement for the purpose of bolstering a witness' credibility, the State contends that here the prior consistent statement was properly introduced to rebut allegations that the witness was motivated to lie.

While a prior consistent statement may be admitted to rebut allegations that the witness was motivated to lie, "of course, it must be shown that the presently imputed motive did not exist at the time of the prior statement. [Citations.]" (*People v. Tidwell* (1980), 88 Ill. App. 3d 808, 810, 410 N.E.2d 1163.) Here, Ochoa's alleged motivation to lie was to escape being charged with the murder by accusing another. Clearly such motivation existed when Ochoa gave his initial statement to the police inculpating defendant. Thus, this exception to the rule precluding admission of a witness' prior consistent statement did not here apply, and Ochoa's prior consistent statement should not have been admitted into evidence. However, we do not find that this error mandates a new trial. Ochoa's prior identification of defendant as a shooter was supported by the testimony of two other eyewitnesses. Thus, in view of this cumulative evidence, the admission of Ochoa's prior consistent statement was harmless error. *People v. Olmos* (1978), 67 Ill. App. 3d 281, 384 N.E.2d 853.

For the reasons stated herein, defendant's conviction is affirmed.

Affirmed.

HARTMAN, P.J., and STAMOS, J., concur.