THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SOLOMON BROWN, Defendant-Appellant.

First District (1st Division)   No. 1—86—3125

Opinion filed June 25, 1990.

Michael J. Pelletier and Barbara Kamm, both of State Appellate Defender's Office, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, James E. Fitzgerald, and Christine Perille, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MANNING delivered the opinion of the court:

Defendant, Solomon Brown, and codefendants Hiram Boone and Kenneth Baker, neither of whom is a party to this appeal, were charged by indictment with aggravated criminal sexual assault, criminal sexual assault, unlawful restraint and aggravated battery against complainant. All three men were tried jointly in a jury trial. Kenneth Baker was found not guilty of all of the charges. Hiram Boone was found guilty of criminal sexual assault, and defendant was found guilty of aggravated criminal sexual assault. After hearing evidence in aggravation and mitigation, the court sentenced defendant to six years' imprisonment.

On appeal defendant raises the following contentions: (1) whether prejudicial error resulted when the court allowed Milton Smith, a State witness, to testify regarding his opinion as to the alleged incident and the assistant State's Attorney to testify as to prior consistent and inconsistent statements allegedly made by Smith; (2) whether prejudicial error resulted from the trial court's cross-examination of a defense witness; (3) whether the trial court improperly denied defendant's motion for directed verdict and improperly submitted jury instructions on the charge of aggravated criminal sexual assault predicated upon the threat of use of a gun; and (4) whether defendant was proved guilty beyond a reasonable doubt.

The State's case in chief consisted substantially of the testimony of complainant. She testified that on August 27, 1984, she left her apartment between 6 p.m. and 7 p.m. to visit her girlfriend, Adrienne, who lived in a building approximately four to five blocks away at 45th Street and Michigan Avenue. Complainant remained at Adrienne's until about 8 or 8:30 p.m. Defendant, also known by the name of "Butter" and whom complainant had known for approximately two months, offered to give her a ride home. She accepted the ride and rode with him to a liquor store a few blocks away. At this time they each had a drink. Defendant inquired if complainant would ride with him to his house to pick up something, and she agreed to do so. Then, defendant drove to "40 something" and Michigan where he got out of the car and spoke to a friend. Next, defendant took complainant to 73rd and Vincennes at which time she called her daughter Yolanda to give her the address of the apartment and inform her that she would be home soon.

The complainant further testified that defendant then offered her another drink, which she refused, and made a telephone call himself. Shortly thereafter, Kenneth Baker, who was wearing a "Maxie Clean" shirt and was known as "Max", came into the apartment. They talked for a while and then defendant told complainant to take a look around his bachelor pad. While looking around the apartment, defendant pushed her into the bedroom, grabbed at her, and repeatedly told her to take off her clothes or he would tear them off her. Defendant wrestled with complainant, threw her on the bed and engaged in sexual intercourse with her. After this incident, Baker came into the bedroom. When complainant refused to perform oral sex on Baker, defendant hit her on the head and back. Then, complainant proceeded to engage in oral sex and sexual intercourse with Baker. Defendant again hit her "upside of the head" and forced her to have oral sex with him. Soon thereafter, Baker left and a person, identified as Hiram Boone, entered the room. Defendant told Boone to have complainant, at which time Boone then engaged in oral sex with her. During this time, defendant hit complainant with his fists and a piece of scrap from a radio. When defendant and Boone left complainant alone in the room, she attempted to escape out of a window but was unsuccessful because the window had bars on it.

Complainant further testified that a fourth man visited the apartment that evening. However, he did not engage in sex with her. Complainant went to the dresser, where defendant began to hit her in the head and back. She hit the dresser and cut her hand on some glass. Boone took complainant to the bathroom to put water on the cut.

During this time, defendant stood in the hallway threatening to kill complainant. Complainant testified that defendant told Boone to get his gun, which Boone refused to do. Defendant then told Boone to get his knife so he could cut off complainant's head and cut out her heart, which Boone also refused to do. Boone told complainant to lock herself in the bathroom. Soon thereafter, Boone removed complainant to his bedroom. By this time, defendant had passed out. Thereafter, Boone took defendant's car and drove complainant to a building close to her apartment. Complainant testified that Boone told her that he wanted to date her.

Once in the apartment, complainant told her daughters that she had been raped by "Butter" and two other men. Her daughter, Yolanda, telephoned complainant's sister Connie, who then called the police. The police took complainant to the hospital for an examination.

Edward Elam, complainant's cousin, testified that on the morning of August 28, 1984, he saw the complainant at her sister Connie's house, and first learned about the incident. Elam then went to South Vincennes, where he saw a man wearing a Maxie uniform drive off from that address. Elam followed the car and man, later identified as Kenneth Baker, to a building. Elam then called the police, who arrived at the building and arrested Baker.

Police officer Joyce testified that on the afternoon of August 28 she accompanied complainant to the Vincennes Avenue address where defendant answered the door. The police found complainant's earring and a scrap of radio inside the bedroom in the apartment. They also found a gun under the bed. Officer Joyce also testified that complainant's face was swollen on the side, she had a few knots on her head and some welts on her back and legs. The officer stated that complainant had told her that Baker and defendant repeatedly took turns engaging in sexual acts with her for several hours.

Complainant's daughter, Yolanda, testified that she had met defendant prior to the incident. Although she had never seen her mother alone with him, she had seen her mother, Adrienne and defendant sitting and talking on Adrienne's porch. She stated that when her mother came home the morning of August 28, 1984, she noticed bruises on her face.

Milton Smith, a co-worker of defendant and Baker at Maxie Clean, recounted that at approximately midnight on August 27, 1984, he arrived at the apartment located at 7355 South Vincennes to pick up Baker for work. While he sat in the living room talking to Baker, defendant continually called for him to come back to the bedroom. He went to the bedroom and saw the defendant, Boone and a woman.

Both defendant and the woman were naked. Smith also testified on direct examination that the woman was sitting crouched on the edge of the bed with her head down and mumbling something like "can't believe this." Smith further stated that the group was "doing a lot of drinking" and talking. Defendant told him to have a drink and "some of this." When questioned further, Smith stated that he understood this to mean that defendant was referring to the woman. However, Smith told defendant that he was crazy and left the room.

On cross-examination, Smith stated that the woman did not cry out for help or attempt to leave the bedroom while he was there. He also conceded that when the defendant said "have some" he could have been referring to a drink. He further stated that he did not believe what was happening was anything serious. On redirect, Smith denied ever telling the assistant State's Attorney that he had left the room because he thought the woman was being raped.

Detective Kulkulka testified to the details of his investigation of the incident and recounted Boone's statement to him. During the interview, Boone told him that upon arriving at home, he saw defendant in the bedroom with a naked girl. He later saw them fighting, and when the girl cut her hand on a glass, Boone took her into the bathroom to wash the cut. The girl told him that she did not want to be there, and when the defendant passed out, Boone drove her home.

Assistant State's Attorney Joseph McNerney testified that on June 23, 1986, the day before the commencement of the trial, he interviewed Milton Smith. Over defense counsel's objections, he was allowed to testify as to this conversation. He stated that during this pretrial interview, Smith told him the woman said something similar to "I can't believe this," or "I can't believe they are doing this to me." When Smith declined defendant's offer of the woman, she breathed a sigh of relief. McNerney further testified that Smith never told him that he thought this incident was a joke. On cross-examination, McNerney stated that although Smith did not tell him he ever saw anyone engaging in sex, he did tell him that he understood defendant made an offer of sex to him.

The defense called Belinda Williams and Melvin Burns, neighbors who lived in the same building as complainant's friend Adrienne. They both related how they had observed a fight between complainant and her boyfriend, Dennis, on August 26, 1984, at which time Dennis accused complainant of engaging in sex with defendant. They both related that they saw complainant drinking at Adrienne's apartment on the morning of August 27, 1984. Williams stated that she had seen defendant and complainant together previously. Burns stated that he

saw complainant and defendant leave the building together in defendant's car on August 27, 1984.

Irvin Barnes testified that on the morning of August 27, 1984, he first met complainant as she talked to defendant outside of his father's building. He overheard part of their conversation and learned that complainant would meet the defendant at the building at 6 p.m.

William Stennis testified that in February or March of 1984, defendant brought a woman named "Theresa" to his house. On this occasion, the group sat in the basement and drank some beer. He later went upstairs to bed, and defendant and the woman spent the night in his guest room in the basement.

Defendant testified on his own behalf. He stated that he and complainant had engaged in consensual sexual intercourse on a number of occasions prior to August 27, 1984. On the morning of August 27, 1984, defendant and Irvin Barnes went to visit defendant's father, who lived in the same building as Adrienne. As he parked his car, he saw the complainant, at which time they arranged to meet at 6 p.m. to go to a motel to have sex.

Later that evening, defendant and complainant left the building together as arranged. They went to a liquor store where the complainant purchased some liquor and had a drink. Then, they went to his cousin's place of employment to pick up the keys to his apartment because defendant did not have money for a motel. Once they reached the apartment, which Boone and Baker shared, complainant called home and gave someone the address to the apartment. Then, defendant and complainant sat on the couch, drank some more alcohol and kissed. Defendant stated that after Baker came home, complainant was embarrassed to be kissing in the living room, so at her request they went into the bedroom. Therein, they had consensual sexual intercourse for the next few hours.

Defendant further testified that he and complainant were drinking heavily and were both intoxicated. He passed out and slept on and off while in the bedroom. However, he remembered arguing with complainant over money and reefer and that she became angry when he refused to give her any money or reefer or take her home. Defendant denied ever seeing Boone or Baker engage in sex with the complainant. He further denied hitting complainant, threatening or coercing her, offering her to Smith for sex, or having any knowledge that a gun was under the bed.

Boone testified that on the evening in question he visited a friend immediately after work and arrived at his apartment after 11 p.m. He found Baker asleep on the couch. However, Baker awakened to re-

spond to Boone's questions. At this time, Boone heard loud music and talking coming from the back of the apartment. He proceeded to the bedroom and knocked on the door. When the defendant let him into the room, he could see that defendant and complainant were naked. She was under the covers and the light was turned off. Defendant offered Boone a drink, which he accepted. They conversed and drank for a while. Next, defendant invited Smith into the bedroom and offered him a drink. Soon thereafter, Baker and Smith left the apartment, and Boone went to his bedroom. At about 3:30 p.m. Boone heard loud noises and some bumping. He went to the other bedroom, where he saw the complainant banging her hand on the dresser and demanding that defendant give her some money. When she cut her hand on a drinking glass, Boone took her to the bathroom and washed her hand. At this time, defendant gave Boone the keys to his car and asked him to take complainant home. Boone stated that he had to block the complainant from entering the room again because she wanted to start a fight with defendant. Boone then drove complainant to 45th and Federal Streets.

Baker, defendant's cousin, testified that around 6:15 p.m. defendant came to his job to borrow the keys to his apartment so he could entertain complainant. He got off from work at 10 p.m. He stopped to purchase some gas and arrived at the apartment at approximately 10:30 p.m. At this time, he saw defendant and complainant kissing on the couch. However, the two eventually went into the bedroom and took a bottle of Crown Royal with them. Baker ate something and fell asleep. Thereafter, Baker left the apartment with Smith to go to another worksite.

Following rebuttal testimony, and at the close of the evidence, counsel moved for a directed verdict, which the court denied.

Because we reverse the conviction and remand for a new trial, we need not address all of the issues raised by the defendant.

Defendant first asserts that the trial court's conduct during the trial was so prejudicial as to deprive him of a fair trial. Specifically, he maintains that the trial court's cross-examination of a defense witness took on the role of the prosecutor, discredited the witness' testimony, and implied that he was involved in other crimes or acts of misconduct.

The State argues that the trial court properly acted within its discretion during the court's own examination of the witness because the questions sought to clarify her testimony. Initially, however, the State contends that this issue is waived because of defendant's failure to object at trial or in his post-trial motion.

██ █ It is well settled that a proper objection at trial and in a written post-trial motion are essential to preserve an issue for review. (*People v. Enoch* (1988), 122 Ill. 2d 176, 190, 522 N.E.2d 1124.) Failure to so object waives any error absent a showing of plain error (*People v. Collins* (1985), 106 Ill. 2d 237, 275, 478 N.E.2d 267), and a defendant's conviction may be reversed only upon a showing that the alleged error affects substantial rights or was sufficiently prejudicial to deny the defendant a fair trial. (107 Ill. 2d R. 615(a).) However, the waiver rule is less rigidly applied when the trial judge's conduct is the basis for the objection (*People v. Sprinkle* (1963), 27 Ill. 2d 398, 401, 189 N.E.2d 295), in light of "the fundamental importance of a fair trial and the practical difficulties involved in objecting to the conduct of the trial judge." (*People v. Heidorn* (1983), 114 Ill. App. 3d 933, 936, 449 N.E.2d 933. Accord *People v. Johnson* (1980), 83 Ill. App. 3d 586, 588, 404 N.E.2d 531.) Thus, we will consider the merits of this issue.

Defendant objects to the trial court's examination of one of the defense witnesses. During the trial, defendant testified that on the night in question he engaged in consensual sexual intercourse with complainant. In support of this defense he presented evidence that he and complainant had an ongoing intimate relationship. His defense counsel subpoenaed the register records of the Barbara Ann Motel, at which defendant contended most of their prior sexual encounters had occurred.

██ Pursuant to this subpoena, Bracey, co-owner of the motel, testified that she was unable to find the register records because the motel was leased to someone else who kept the records. However, Bracey testified that she worked at the desk at the motel, and defendant looked like someone who had registered at the motel. Following cross-examination by the prosecutor, the judge conducted the following examination of Bracey:

"THE COURT: Miss Bracey, would you describe the children he may have come to the motel with?

A. No. I don't recall any children.

Q. Would you show us the business records from your motel that you pay taxes to the State of Illinois?

A. At that time it was leased out. So, we wouldn't have any other people's records.

Q. Would you show us the registrations and the forms you used to pay taxes to the City of Chicago?

A. At that time?

Q. Yes.

A. You're speaking of 1984?

Q. Yes.

A. We'd have no records, because it was leased out.

Q. But yet, you still think you recognize people that come to the motel?

A. Well, I was working.

Q. What was your capacity working there?

A. Desk clerk.

Q. And as a desk clerk, did you fill out any books and records?

A. Yes, you fill out a registration. They fill out the registration card. You fill out a registration sheet.

Q. Where are the registration cards and registration sheets for the five months that the records were subpoenaed for?

A. At that time it was leased out. So I wouldn't have any control over them.

Q. You could still have access to them, don't you?

A. As far as me writing on the registration sheet at that time, once the person who leased it out takes it away, I have no control over them.

THE COURT: Okay. Any other questions?"

The propriety of judicial examination of a witness is determined by the circumstances in each case and rests largely in the discretion of the trial court. (*People v. Hopkins* (1963), 29 Ill. 2d 260, 265, 194 N.E.2d 213; *People v. Palmer* (1963), 27 Ill. 2d 311, 314, 189 N.E.2d 265.) The trial judge has discretion to question witnesses in order to elicit the truth or clarify material issues which seem obscure. (*People v. Wesley* (1959), 18 Ill. 2d 138, 155, 163 N.E.2d 500, *cert. denied* (1960), 364 U.S. 845, 5 L. Ed. 2d 69, 81 S. Ct. 87.) However, the trial court does not have unlimited discretion, and in protecting a defendant's right to a fair and impartial trial by jury, the trial judge himself must be fair and impartial (*People v. Bradley* (1984), 128 Ill. App. 3d 372, 382, 470 N.E.2d 1121), conduct himself so as not to give the jury the impression of his feelings (*People v. Santucci* (1962), 24 Ill. 2d 93, 98-99, 180 N.E.2d 491; see also *People v. Ferguson* (1973), 11 Ill. App. 3d 914, 297 N.E.2d 658), and not make any comments or insinuations indicative of an opinion on the credibility of a witness. See *People v. Cobbins* (1987), 162 Ill. App. 3d 1010, 516 N.E.2d 382.

■ ■ One of the reasons behind the rule that the trial judge must exercise a high degree of care to avoid influencing the jury in any way (*Sprinkle*, 27 Ill. 2d at 403) is based on the belief that the trial judge has immense influence over the jury. (*People v. Marino*

(1953), 414 Ill. 445, 450-51, 111 N.E.2d 534.) Another very fundamental reason is that every defendant is entitled to a trial that is free from improper and prejudicial comments on the part of the trial judge. (*Heidorn*, 114 Ill. App. 3d at 936; see also *People v. Merz* (1984), 122 Ill. App. 3d 972, 461 N.E.2d 1380.) In reviewing the trial judge's alleged errors, this court must determine whether reversible error occurred. For the comments or questioning by a trial judge to constitute reversible error, the defendant must demonstrate that they were a material factor in the conviction or that prejudice appears to have been the probable result. *Heidorn*, 114 Ill. App. 3d at 937; see also *Cobbins*, 162 Ill. App. 3d at 1028.

■ ■ We have carefully reviewed the record and the trial court's questioning of Ms. Bracey. We find that it was unnecessary for the trial court to have conducted its own cross-examination of the witness in general, and in particular, to have inquired about her tax records with the city and State. We hold that such questioning was improper in that the trial court exceeded its function in a jury trial and in fact invaded the province of the jury by making insinuations as to the witness' veracity. The decision of the veracity or credibility of a witness must be left to the jury. (*Santucci*, 24 Ill. 2d at 98.) In so holding, we follow the long-established rule in Illinois that a trial judge must not in the presence of a jury invade the province of the jury by making any remarks indicative of belief or disbelief in the integrity or credibility of a witness. *Marino*, 414 Ill. at 450. Accord *People v. Godbout* (1976), 42 Ill. App. 3d 1001, 1006, 356 N.E.2d 865.

■ We further find that the trial court's question which asked the witness to "describe the children he [defendant] may have come to the hotel with" was highly improper and prejudicial. This remark implied that the defendant was involved in other crimes or acts involving children. The inference to be drawn left the jury to speculate as to the nature of that misconduct. Our supreme court has held that "an insinuation which leaves the jury to speculate may be more prejudicial than erroneously admitted specific proof." (*People v. Emerson* (1983), 97 Ill. 2d 487, 497, 455 N.E.2d 41; see also *People v. Dukes* (1957), 12 Ill. 2d 334, 342, 146 N.E.2d 14.) Moreover, based on the factual matrix here presented, it would have been error for the State to bring in improper other crimes evidence. (*People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489.) The rationale belying this rule is that the defendant may be convicted on the jury's conclusion that the defendant has a propensity to commit crimes rather than on the facts of the case. Thus, we believe that it is even more prejudicial for the trial judge to bring in other crimes evidence since the jury is more

likely to rely upon the judge's opinion in reaching its verdict.

We also believe it was error for the trial court to allow State witness Milton Smith to testify as to his opinion of what occurred in the apartment on the night in question and to allow an assistant State's Attorney to testify as to what Smith previously had revealed to him.

■ The State asserts that these issues have been waived for review because defendant failed to present the specific alleged errors in his post-trial motion. In the alternative, the State asserts that the examinations were proper because it properly questioned Smith regarding his observations while he was in the bedroom and properly questioned the assistant State's Attorney in order to lay the foundation for later impeachment of the witness. The State argues that either no prejudice resulted from this testimony and if there were any prejudice it was cured, or any resulting error was harmless because of the overwhelming evidence of defendant's guilt. Initially, we find that this issue has not been waived on appeal. A review of the record demonstrates that although the defendant charged the trial court with a general allegation of error "in sustaining objections of the defendant asked by the assistant State's Attorneys of their witnesses;" counsel made timely objections to the testimony at trial and specifically pointed out the alleged errors to the court during oral argument on the post-trial motion, so that the trial court had an opportunity to consider and correct any alleged error. See *People v. Ammons* (1983), 120 Ill. App. 3d 855, 458 N.E.2d 1031.

Defendant contends that it was reversible error for the prosecution to question Milton Smith about his opinion of whether the complainant was being held against her will or being raped. Further, defendant asserts the error was compounded when the State then elicited testimony from another witness, Assistant State's Attorney McNerney, regarding prior consistent and inconsistent statements allegedly made by Smith to show what was Smith's opinion of the incident, to bolster Smith's testimony and to improperly introduce evidence to which Smith had not testified.

First, we will consider defendant's contention that the court improperly allowed opinion testimony by Milton Smith. Defendant argues that the answers which were elicited from this witness were highly improper and prejudicial to him because they went to the ultimate question of fact to be decided by the jury, *i.e.*, whether or not the complainant was forced to engage in the sexual acts.

■ It is well settled in Illinois that the testimony of a lay witness must be confined to statements of fact of which the witness has personal knowledge. (*People v. Rosenbaum* (1921), 299 Ill. 93, 132 N.E.2d 433.)

Although our courts have allowed a witness to testify as to his observations or sensory perceptions (*People v. Burton* (1972), 6 Ill. App. 3d 879, 286 N.E.2d 792), the general rule is that testimony of a witness' opinion is not admissible into evidence. (*People v. Linkogle* (1977), 54 Ill. App. 3d 830, 833, 368 N.E.2d 1075.) In *Linkogle*, the trial court permitted the mother of the prosecuting witness to testify to what she thought her daughter meant by "wriggle his thing." This court held that such opinion testimony by the mother was not admissible.

■■ In the case at bar, the State urges that they merely questioned Smith about his observations while in the bedroom. We disagree. Smith was allowed to testify to what he thought the defendant meant by the remark "have some of this." This line of questioning and subsequent response exceeded the realm of Smith's opinion or conclusion based on any observations. The persons in the apartment were drinking heavily and at least two people in the bedroom were naked. The conclusion that "have some of this" referred only to sex or the woman was not an obvious conclusion. (*Cf. People v. Sepka* (1977), 51 Ill. App. 3d 244, 367 N.E.2d 138.) Nor did the questions call for mere sensory perceptions. See generally *People v. Burton* (1972), 6 Ill. App. 3d 879, 286 N.E.2d 792.

Accordingly, we believe that the trial court committed reversible error by allowing Smith to testify as to what defendant meant by his remarks. (Accord *Linkogle*, 54 Ill. App. 3d at 833.) Moreover, we find that this testimony was improper and prejudicial to the defendant because it went to the ultimate question of fact to be decided by the jury, *i.e.*, whether or not the complainant was engaging in forced or consensual sexual acts.

■■ We believe that it is unnecessary to fully expand upon all of the principles of law to be utilized in making a determination whether the trial court erred when it allowed McNerney to testify as to prior consistent and inconsistent statements made to him by the witness. Suffice it to say that the record does not demonstrate that the State made any claims during its examination that Smith had recently fabricated his testimony so that any alleged prior consistent statements then would be admissible. (See, *e.g., People v. Smith* (1985), 139 Ill. App. 3d 21, 32, 486 N.E.2d 1347.) Further, the rule against inadmissibility of prior consistent statements also applies to a third party who seeks to testify concerning the witness' prior consistent statement. *People v. Fuelner* (1982), 104 Ill. App. 3d 340, 351, 432 N.E.2d 986.

■■ ■ Neither was it necessary to use McNerney to testify as to prior inconsistent statements made by Smith. Smith was available and testified before the jury. The State had ample opportunity to examine

him as a hostile witness and thus impeach him if it could do so. Although any party, including the party calling him, may attack the credibility of a witness and may do so by impeaching the witness with prior inconsistent statements (87 Ill. 2d R. 238(a); *People v. Amato* (1984), 128 Ill. App. 3d 985, 986, 471 N.E.2d 928), we believe that the State would have been unsuccessful in this venture. In order to impeach a witness with prior inconsistent statements, the State was required to show that the testimony had damaged rather than supported its position. (*People v. Amato* (1984), 128 Ill. App. 3d 985, 471 N.E.2d 928.) Thus, we agree with the *Amato* court that the only possible reason to question the witness here was to bring impermissible hearsay to the attention of the jury or bolster Smith's testimony.

Accordingly, we find that the error of allowing Smith to give improper opinion testimony was compounded when the court allowed the assistant State's Attorney to testify as to what the first witness understood and said. As the court stated in *Linkogle*:

"It is the province of the jury to make inferences from and interpret the statements of the witnesses, having had an opportunity to hear the testimony and observe the demeanor of each witness." *Linkogle*, 54 Ill. App. 3d at 833.

When the prosecutor asked McNerney if he had questioned Smith about whether or not Smith thought the woman was being raped, defense counsel objected, the court sustained the objection and a sidebar was held on the objection. However, notwithstanding the trial court's ruling, the prosecutor sought to elicit from McNerney testimony regarding Smith, which was not only inadmissible as opinion testimony, but also inadmissible as prior consistent and inconsistent statements.

We find that the errors in combination resulted in manifest prejudice to the defendant, and we reverse the conviction and remand for a new trial.

Finally, while we believe the evidence at trial was close due to the witnesses' conflicting testimony, we find it to be sufficient to support a conviction if believed by the trier of fact. In this case, both parties presented evidence to support their respective theories; however, we believe the evidence may have been misleading as a result of the trial court errors. Nonetheless, we make no finding as to defendant's guilt or innocence which would be binding on retrial. *People v. Taylor* (1979), 76 Ill. 2d 289, 391 N.E.2d 366.

Reversed and remanded.

BUCKLEY, P.J., and O'CONNOR, J., concur.