THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LAVAL WILLIAMS, Defendant-Appellant.

First District (5th Division)    No. 1—90—3499

Opinion filed March 26, 1993.

Rita A. Fry, Public Defender, of Chicago (Hugh Stevens, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James Fitzgerald, and Andrew Dalkin, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE GORDON delivered the opinion of the court:

Following a jury trial, defendant was found guilty of murder and sentenced to 55 years in prison. He appeals, contending that (1) prosecution witnesses were improperly allowed to explain what the defendant meant when he said the deceased "died like a bitch"; (2) the jury was improperly informed of the State's witnesses' prior consistent statements; and (3) the jury was not properly instructed regarding the substantive use of the State's witnesses' prior consistent statements. For the reasons set forth below, we affirm.

FACTS

The victim, Aaron Smith, was stabbed to death in the early morning hours of May 9, 1989, at a house located at 1525 Greenwood in Ford Heights. Smith, who was 31 years old when he died, was slightly retarded and lived with his sister in Chicago Heights. Defendant lived at 1525 Greenwood with his sister Fe-Fe.

Linda Johnson testified that at about 6 a.m. on May 9, 1989, she and two friends were going to 1525 Greenwood to purchase some cocaine. When they arrived, the door was open, and they went in, whereupon they discovered the victim. They asked a neighbor to call the police.

Derrick Humphrey, also known by the nickname "Piggy," testified that at 3 a.m. on May 9 he was at 1525 Greenwood along with Earl Johnson and the victim, who were smoking dope. Humphrey testified that he fell asleep on a couch in the living room, and the next thing he remembers is waking up at 5:30 a.m. when he heard someone starting a car which was parked outside the front window. Johnson and the defendant, Laval Williams, were in the car. Humphrey got into the driver's seat, and the three drove away. Humphrey noticed a police car behind his car. They drove to a laundromat on Woodlawn where Humphrey called a friend, and then the three went to the home of Henry Bentley on 111th Street and Drexel. Humphrey referred to Bentley as his "partner." Bentley was not at home.

Humphrey testified that he, Johnson and defendant then drove

to a house on 17th and Ellis, where defendant's hairdresser lived. The defendant left the car for about two minutes. After defendant returned, as they were driving away, Humphrey noticed a lot of people running to the house at 1525 Greenwood. They dropped Johnson off at 15th and Ellis, and Humphrey and defendant were alone in the car.

According to Humphrey, defendant said he had to tell Humphrey something. Defendant told him that he had left his bags in the bathroom at 1525 Greenwood, and the victim had stolen them. Defendant and the victim "got into it" and defendant "stuck him in the stomach." Defendant said that when the victim said he was going to call the police, he "took him out" and stabbed him "a lot." Humphrey said he noticed blood on defendant's white shirt.

Humphrey and defendant then drove to Humphrey's sister's house. Henry (James) Dismukes, defendant's sister Fe-Fe, and Humphrey's sister Anita were there. Humphrey testified that while pacing the floor in the front room of the house, defendant said "he died like a bitch." When the prosecutor asked Humphrey what that meant to him, Humphrey replied, "Because I guess he wouldn't fight him back or something." At that point, defendant was thrown out of the house.

The police came to the house later that day, and Humphrey went to the Ford Heights police station. Humphrey testified that he told the police what he had just testified to in court.

On cross-examination, Humphrey was shown a statement, dated October 29, 1989, which bore his signature. In that statement was written:

"I Derrick Humphrey is [sic] givien [sic] a true statement and I am not being forced or made to give this statement. The incident happend [sic] at 1525 Greenwood. The person Laval Williams did not tell me and I did not see him kill Aaron Smith. And that Ford Hts police harrasted [sic] me and told me if I didn't say that Laval did it that I was going to jail for it."

Humphrey explained that he did not write the first sentence. The remainder, however, was in his handwriting. When he wrote and signed the statement on October 29, defendant was already in custody. Humphrey had also testified to the grand jury prior to writing the statement.

On redirect, Humphrey said he never swore under oath that the written statement was true. The paper was given to him by Fe-Fe, defendant's sister. He said he signed it because he "didn't want anybody nagging me on my back about the situation." Although he wrote that Laval Williams did not tell him that he killed Aaron Smith, Humphrey testified "but he told me, though."

The next witness was Earl Johnson. He testified that on the evening of May 8, 1989, he saw Derrick "Piggy" Humphrey and the victim, Aaron Smith, at 1525 Greenwood, which Johnson described as "a chill out house" or a place where people "hang around and smoke dope, drink." Johnson testified that he was at the house early on the evening of May 8 for about 15 minutes, and when he left, Derrick Humphrey was asleep and the victim was cleaning the kitchen. When Johnson returned to the house between five and six the next morning, the defendant was coming out of the house. Defendant got into Johnson's car, and as they were pulling away, Derrick Humphrey came out of the house. As the three drove away, Johnson noticed a police car behind them.

After stopping at a house at 11th and Ellis, they drove to 17th and Greenwood, where defendant left the car for three or four minutes. They then drove to 15th and Berkley, where they saw a commotion. When Johnson went to see what was going on, he found out that Smith had been killed.

The State called Henry Bentley as its next witness. At 10 or 11 p.m. on May 8, Bentley was at 1525 Greenwood. Anita Humphrey (Derrick's sister), Marcia Dismukes, James Dismukes, the victim, Aaron Smith, and defendant were also there. Bentley testified that defendant was punching Smith, who was "just standing there crying." Smith did not try to defend himself. Bentley said he pulled defendant off of Smith and told him to stop hitting him. Subsequently Bentley left the house.

At 8 a.m. the next morning Bentley received a call from Derrick Humphrey, who was calling from his sister Anita's house. When Bentley called back, he spoke to defendant and asked defendant why he had killed Smith. Defendant said he did not do it, but jocularly added "Freddie Krueger did it." Defendant also told Bentley that "he died like a bitch," which, to Bentley, meant that he did not fight back. Bentley further testified that defendant told him that he had stabbed the victim with a steak knife in the head, because the victim had taken something from him, and had thrown the knife in a field. Bentley testified that he previously told the police and the grand jury what defendant had told him and what he had just testified to.

Marcia Dismukes was the State's next witness. She testified that on the afternoon of May 9, 1989, she heard defendant tell his brother that the defendant had killed Aaron Smith. Dismukes then asked defendant to swear on the Bible that he had killed Smith, to which defendant replied "I don't have to put my hand on no Bible, I killed the m—— f——." Defendant said he thought Smith had taken some drugs from him. Dismukes also testified that defendant said the victim

"died like a bitch." The prosecutor asked what that meant to her, and she replied "it means to me like he died without fighting back."

On cross-examination, Dismukes admitted that her original signed statement to the police did not include the phrase "died like a bitch." The witness was also shown a statement in her own handwriting and signed, which was dated August 15, 1990. She had written "I never heard Laval Williams say anything about the death of Aaron Smith." The statement went on to say that her earlier statement was false and was made because of pressure from the police.

On redirect, Dismukes explained that she was asked to sign the August 15 statement by defendant's brother, who showed her a letter from defendant telling her what to say and telling him to make sure she signed. She said that the August 15 statement was not true.

The State's next witness was Anita Humphrey. On the afternoon of May 8, 1989, she had been at 1525 Greenwood, where she saw defendant. Early in the morning of May 9, 1989, she received a call from her brother Derrick, who told her that defendant had killed Smith. A short time later her brother and defendant arrived at her house, and defendant talked about the killing. He said that Smith had "died like a bitch." Defendant thought the victim had taken some of his drugs, and he had to kill him because he was afraid he might tell the police. While he was stabbing him in the head and chest, the victim said "please don't kill me, I won't tell the police, just let me go." Anita Humphrey said that at the time defendant was wearing jeans or black pants, a leather jacket, but no shirt. Later that day one of her brothers brought her a T-shirt which she had seen defendant wearing the night before the murder. The shirt looked like it had been washed. She gave the shirt to the police. She also gave a statement to the police.

On cross-examination, Anita Humphrey was shown a statement she signed on October 29, 1989. Although the statement was notarized, Humphrey denied signing it in front of a notary public or taking it to get it notarized. The statement read:

> "I Anita Humphrey is givien [sic] a true statement and I am not being forced or made to give this statement.
>
> Level [sic] did not tell me that he kill [sic] Aron [sic] Smith I said that because they were going to say my brother Derrick Humphrey did it."

According to the witness, when she signed the statement, the second paragraph was not there. She was not sure whether the first paragraph was there when she signed.

Humphrey testified on redirect that she signed the statement

because defendant's sister had been giving her family problems, such as stealing a car.

James Dismukes was the next witness for the State. On the morning of May 9, he was at Anita Humphrey's house. Anita, Derrick Humphrey, defendant, and defendant's sister Fe-Fe were also there. Derrick told Dismukes that defendant had killed the victim. Dismukes testified that when he asked the defendant about it, defendant said "Freddie Krueger" did it. Defendant also explained to Dismukes that he stabbed the victim because the victim was stealing from him.

On cross-examination, defense counsel questioned Dismukes about a meeting they had in July of 1990. At that meeting, Dismukes gave defense counsel a hand-written statement wherein he said, "Well, I really don't remember what happened, who said what. All I know, I didn't real [sic] hear him state it out of his mouth, meaning Laval, so I am a little confused." Dismukes later explained that he signed the statement because he "was hurrying up trying to get him out of my face."

Officer Harold Bridges of the Ford Heights police department testified concerning his investigation of the murder. He said that on May 10, 1989, the police received a phone call from an unidentified caller who said that if they wanted the knife that killed Smith, they should go to 17th Street. When they got there, several people pointed them to a field where they found a steak knife.

Dr. Robert Kirschner, a forensic pathologist with the office of the Cook County medical examiner, performed the autopsy on Smith which revealed multiple stab wounds, one of which penetrated the heart and two of which penetrated the victim's right lung. Toxicology tests were negative for alcohol and opiates but positive for phencyclidine, a metabolite of cocaine.

Dr. Kirschner was also shown a knife with a serrated blade and a broken tip. He testified that the victim's wounds were consistent with the type of wounds that would be caused by such a knife. On cross-examination, the witness said that none of the victim's wounds showed evidence of serration. He explained that even with a serrated knife, one does not always see serration of the wounds. Dr. Kirschner also testified that he did not find the tip of the knife or any other pieces of metal on the victim's body.

The parties stipulated that the white T-shirt given by Anita Humphrey to the police and a leather jacket taken from defendant were analyzed for blood. The stains found could have been defendant's blood and could not have been from the victim. There was a further stipulation that the knife was tested and found negative for the presence of blood and fingerprints.

The State rested its case, and the court denied defendant's motion for a finding of acquittal. The defense also rested.

An instruction conference was held, and no objections were made to any instructions offered, nor were any offered instructions refused.

Following closing arguments, the jury found defendant guilty of first degree murder. Defendant's motion for a new trial was denied, and the court sentenced him to 55 years' imprisonment. This appeal followed.

OPINION

Defendant raises three issues on appeal. First, he urges that reversible error occurred when four prosecution witnesses, Derrick Humphrey, James Dismukes, Henry Bentley and Marcia Dismukes, were allowed to explain what the defendant meant when he said the victim "died like a bitch." He contends that it was improper to allow these witnesses to state their opinions regarding defendant's statement and that their testimony was highly prejudicial.

The State argues initially that defendant has waived this issue by the failure to object at trial or to raise the issue with any specificity in his post-trial motion. Defendant urges, however, that we consider admission of this testimony as plain error. He contends that the evidence was closely balanced and the errors of considerable magnitude. Alternatively, defendant asks that counsel's failure to properly preserve the issue be considered as ineffective assistance of counsel.

To preserve an issue for appellate review, a defendant must offer an objection at trial and raise the matter with some specificity in his post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186-88, 522 N.E.2d 1124.) Failure to do both results in waiver. Defendant concedes that he failed to object at trial, and our review of the record indicates that this issue was not specifically raised in his post-trial motion. As noted above, however, defendant urges application of the plain error rule.

The plain error doctrine may be invoked as an exception to the waiver rule to correct errors in criminal cases where the evidence is closely balanced or where the error was of such magnitude as to deny defendant a fair trial. (*People v. Cox* (1990), 197 Ill. App. 3d 1028, 1036, 557 N.E.2d 288.) In this case, however, the evidence is neither closely balanced, nor is the error of a magnitude as to have deprived defendant of a fair trial.

As to the issue of how closely balanced the evidence was, there is no question that the evidence against defendant was overwhelming: Five witnesses testified that defendant told them he had killed Smith.

Derrick Humphrey said defendant told him that he had stabbed Smith "a lot." This confession occurred while Humphrey and defendant were alone in a car. Humphrey also noticed blood on defendant's shirt. Henry Bentley testified that defendant told him over the phone that he had stabbed the victim with a steak knife because the victim had stolen drugs from him. Bentley also testified that defendant told him he had thrown the murder weapon in a field. The police, following an anonymous telephone tip, found a steak knife in a field. The third witness to whom defendant confessed was Marcia Dismukes. When she asked defendant to swear on a Bible, defendant replied that he did not have to swear, that he had killed Smith because he thought Smith had stolen drugs from him. Anita Humphrey also testified that defendant told her he had killed Smith. Defendant explained to her that he killed Smith because he was afraid Smith would call the police. Finally, James Dismukes testified that when he asked defendant why he had killed Smith, defendant said it was because he thought the victim was stealing from him.

Although the evidence against defendant consisted primarily of admissions, their sheer number, detail and consistency combine to create a strong case against him. He confessed to five different people on three separate occasions. He told several people that he killed the victim because he believed the victim had stolen drugs from him. In addition, defendant's admissions were corroborated in other respects. His admission to Bentley that he used a steak knife to kill the victim was corroborated by testimony that the victim's wounds could have been caused by such a knife. Also, defendant's admission to Bentley that he threw the knife in a field was essentially corroborated by the police finding such a knife in a field near to the location where both Johnson and Humphrey said defendant left the car for a few minutes.

In contrast to these repeated detailed and consistent admissions by defendant to different parties at different times and at different places, our review of the record reveals no significant evidence to erode the State's proof. Although defendant introduced statements by several witnesses obviously prepared by him or at his behest, which purported to deny having heard any admissions of guilt by the defendant, these statements were convincingly explained away and disavowed by the witnesses. Thus, we disagree that the plain error rule is invokable because of any closeness in the evidence.

As to the second prong of the plain error rule, which looks to the magnitude of the error, we agree that the testimony complained of was erroneously admitted. We are convinced, however, that it did not constitute error of such magnitude as to deny defendant a fair trial.

Generally, a witness may not offer an opinion as to the meaning

of another's out-of-court statement. (*People v. Holveck* (1990), 141 Ill. 2d 84, 565 N.E.2d 919.) It is within the province of the jury to interpret such statements. (*People v. Linkogle* (1977), 54 Ill. App. 3d 830, 833, 368 N.E.2d 1075.) The testimony of a lay witness should be confined to his personal knowledge, observations or sensory perceptions. (*People v. Brown* (1990), 200 Ill. App. 3d 566, 558 N.E.2d 309.) An exception to this rule may exist, however, where a nonexpert witness has special knowledge and familiarity with a subject and his opinion may aid the jury in its deliberations. See *People v. Stamps* (1982), 108 Ill. App. 3d 280, 438 N.E.2d 1282 (witness, although not qualified as expert, properly allowed to explain meaning of terms of trust agreement in order to make agreement comprehensible).

Here, four witnesses were permitted to testify to what they thought defendant meant when he said Smith "died like a bitch." They all said that, in their opinion, he meant that the victim did not resist. Under *Holveck, Linkogle,* and *Brown,* such testimony was improper. There was no showing made that these witnesses had any special knowledge which would permit them to explain defendant's comment, or that any assistance to the jury in interpreting his words was necessary, so as to bring this case within the scope of *Stamps.*

Nevertheless, the error in admitting this testimony is not of sufficient magnitude to justify reversal under the plain error rule. The victim's lack of resistance was not a contested issue. (Compare *People v. Brown* (1990), 200 Ill. App. 3d 566, 579, 558 N.E.2d 309 (prejudicial to allow witness to testify as to what defendant meant by "have some of this," since it went to the ultimate question of fact, namely, whether complainant consented to sexual acts).) Each of the witnesses who was allowed to offer his or her opinion also testified that defendant told him or her that he had killed Smith. Evidence of the victim's lack of resistance was not essential to defendant's conviction. Had this testimony been excluded, there remains ample evidence of defendant's guilt. In addition, the prejudicial impact of the witnesses' explanations was not of sufficient magnitude to constitute reversible error, when viewed in the light of the other substantial evidence against the defendant. The witnesses' explanations that to them "he died like a bitch" meant that the victim did not fight back, would not, in the context of all other evidence, serve to significantly increase animosity towards the defendant beyond that created by his statement "he died like a bitch" standing alone without an explanation.

■ As to defendant's contention that his trial counsel's failure to properly preserve this issue amounted to ineffective assistance of counsel, we disagree. Under *Strickland v. Washington* (1984), 466

U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, a defendant claiming ineffective assistance of counsel must show both that his counsel failed to perform as a reasonably competent attorney and that absent counsel's error, the result of the proceeding would likely have been different. As noted above in regard to the plain error rule, the evidence against defendant here was overwhelming, and we are satisfied that, even had the erroneously admitted evidence been excluded, the outcome would have been the same.

Defendant next contends that the State improperly elicited testimony concerning four witnesses' prior consistent statements. He argues that the prosecution improperly elicited testimony from Derrick Humphrey, Anita Humphrey, Henry Bentley and Marcia Dismukes that they had made prior statements to the police or the grand jury which were consistent with their trial testimony.

The State contends that this issue, as with the first, has been waived by defendant's failure to object at trial or to raise it in his post-trial motion. Defendant again urges that we consider this issue as plain error.

■ As discussed earlier, invocation of the plain error doctrine in this case cannot be justified on the ground that the evidence was close. Moreover, the magnitude of any error in admitting the prior consistent statements here is also insufficient to warrant relaxation of the waiver rule.

While admission of prior consistent statements other than to rebut charges of recent fabrication is error (see, e.g., People v. Clark (1972), 52 Ill. 2d 374, 288 N.E.2d 363; People v. Smith (1985), 139 Ill. App. 3d 21, 486 N.E.2d 1347), it does not necessarily constitute reversible error. See, e.g., People v. Williams (1992), 228 Ill. App. 3d 981, 593 N.E.2d 968 (reversal not required where evidence not closely balanced, witnesses testified only to fact that his prior statement was consistent with his trial testimony and did not testify to substance of the prior statement, and testimony of witness whose prior consistent statement was erroneously admitted was corroborated by other witnesses and by physical evidence); People v. Borges (1984), 127 Ill. App. 3d 597, 469 N.E.2d 321 (error in allowing witness to testify that his earlier statement to authorities was the same as his courtroom testimony held harmless in view of other cumulative evidence).

Defendant cites to People v. Smith (1985), 139 Ill. App. 3d 21, 486 N.E.2d 1347, and the cases cited therein for support of his contention that admission of prior consistent statements here is reversible error. Those cases, however, are distinguishable from the instant case on two grounds. In each, the actual substance of the witnesses' prior consistent statements was introduced. (See Smith, 139 Ill. App. 3d at

31 (witness allowed to relate the substance of prior conversation); *People v. Andino* (1981), 99 Ill. App. 3d 952, 425 N.E.2d 1333 (police officer permitted to relate substance of his conversation with the victim); *People v. Hudson* (1980), 86 Ill. App. 3d 335, 408 N.E.2d 325 (several witnesses permitted to read their prior consistent statements into the record during their testimony).) In contrast, here none of the witnesses testified as to the substance of their prior statements. They were asked whether they had told the police or the grand jury the same story they had told in court, to which each simply replied yes. Also, in each of the above cases, the prior consistent statements were crucial to the State's case. Here, it cannot be said, in light of the other substantial evidence of defendant's guilt, that the mere acknowledgement of having made prior consistent statements was crucial to the State's case.

The case of *People v. Williams* (1992), 228 Ill. App. 3d 981, 1007, 593 N.E.2d 968, is on point. There the witness was asked "Did you tell those police the same thing you are telling this jury?" to which the witness responded "Yes." In addition, the testimony of the witness was corroborated by that of other witnesses and also by physical evidence. This court held that the error in admitting evidence of prior consistent statements was not of such magnitude as to deprive defendant of a fair trial, and thus the court declined to invoke the plain error rule. So too here, we cannot say that the defendant was deprived of a fair trial by any error in admitting the witnesses' prior consistent statements. Accordingly, invocation of the plain error rule is unwarranted, and we consider this issue waived.

Finally, defendant urges that the jury was incorrectly instructed that it could only use several witnesses' prior inconsistent statements for the purpose of impeachment. He contends that under section 115—10.1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 115—10.1), the jury could have considered the prior inconsistent written statements of Derrick Humphrey, James Dismukes and Marcia Dismukes, in which each stated that defendant did not tell them that he had killed Smith, as substantive evidence. Defendant contends that he was denied his right to a fair trial as a result of the jury being instructed that it could use such statements only for impeachment purposes. He further argues that failure of his counsel to tender a correct instruction amounted to ineffective assistance of counsel.

Under the facts of the case, it is difficult to see what substantive value these statements would have carried apart from impeachment. The statements that defendant did not tell the witnesses that he had killed the victim carried no independent probative content, except to

negate or dilute the witnesses' testimony that the defendant had, in fact, said that he killed the victim, *i.e.*, impeachment.

However, even if these statements had substantive content aside from impeachment, we would find no reversible error.

Section 115—10.1 of the Code of Criminal Procedure of 1963 provides, in part:

> "In all criminal cases, evidence of a statement made by a witness is not made inadmissible by the hearsay rule if
>
> (a) the statement is inconsistent with his testimony at the hearing or trial, and
>
> (b) the witness is subject to cross-examination concerning the statement, and
>
> (c) the statement—
> ***
>
> (2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and
>
> > (A) the statement is proved to have been written or signed by the witness, or
> >
> > (B) the witness acknowledged under oath the making of the statement either in his testimony at the hearing or trial in which the admission into evidence of the prior statement is being sought, or at a trial, hearing, or other proceeding."
> > (Ill. Rev. Stat. 1989, ch. 38, par. 115—10.1.)

There is no dispute that the prior statements at issue here satisfy the conditions of subsections (a) and (b). The State argues, however, that the statements fail to meet the requirements of subsection (c)(2) because they were not based on the personal knowledge of the witnesses.

"Personal knowledge" as used in this section refers to that which has been seen or heard by the witness, and does not include knowledge which the witness gained by being told something. *People v. Cooper* (1989), 188 Ill. App. 3d 971, 972, 544 N.E.2d 1273 (court holds that witness' statement that "Craig Cooper and Walter Eden told me they had just robbed Travis Vaughn" was not admissible as substantive evidence because it was based on knowledge gained by being told about the robbery, and not from his perception of the robbery itself). Accord *People v. Saunders* (1991), 220 Ill. App. 3d 647, 580 N.E.2d 1246; *People v. Coleman* (1989), 187 Ill. App. 3d 541, 543 N.E.2d 555. See generally, Steigmann, *Prior Inconsistent Statements as Substantive Evidence in Illinois*, 72 Ill. B.J. 638 (1984).

As noted earlier, the prior inconsistent statements at issue here were that defendant did not tell the witnesses that he (the defendant) had killed Smith. Clearly, the witnesses had personal knowledge of whether or not defendant had told them something. The prior

statements would, therefore, fall within the scope of the statute as based on personal knowledge of the witnesses and thus be admissible as substantive evidence. To that extent, however, their substantive use is indistinguishable from their impeachment use, since even if considered substantively, the prior statements serve only to prove or disprove whether defendant made the alleged admissions to which the witnesses testified at trial. As a result, any error in failing to instruct the jury regarding the substantive use of the prior statements was harmless.

To the extent the statements would be used to establish independent facts regarding defendant's conduct, namely to establish that he did not commit the acts with which he was charged, the statements would not be admissible substantively under the statute, since the witnesses had no personal knowledge of the murder. The statements could, therefore, be used only for impeachment purposes.

■ As to defendant's contention that he should be granted a new trial since counsel's failure to recognize the substantive value of the prior inconsistent statements amounted to ineffective assistance of counsel, we disagree. As discussed above, under the facts of this case, the substantive value of the prior statements was no different from their impeachment value. Hence, the outcome was not in any sense affected by counsel's failure.

Accordingly, for all the above reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

MURRAY and McNULTY, JJ., concur.